FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALASKA AIRLINES INC., an Alaska corporation,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>JUDY SCHURKE, in her official capacity as Director of the State of Washington Department of Labor and Industries; ELIZABETH SMITH, in her official capacity as Employment Standards Program Manager of the State of Washington Department of Labor and Industries,<br>*Defendants-Appellees*,<br><br>ASSOCIATION OF FLIGHT ATTENDANTS - COMMUNICATION WORKERS OF AMERICA, AFL-CIO,<br>*Intervenor-Defendant-Appellee.* | No. 13-35574<br><br>D.C. No.<br>2:11-cv-00616-JLR<br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, Senior District Judge, Presiding

Argued and Submitted En Banc September 19, 2017
San Francisco, California

Filed August 1, 2018

Before:  Sidney R. Thomas, Chief Judge, and M. Margaret McKeown, Richard A. Paez,[*] Marsha S. Berzon, Richard C. Tallman, Consuelo M. Callahan, Carlos T. Bea, Milan D. Smith, Jr., Sandra S. Ikuta, Jacqueline H. Nguyen and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Ikuta

---

**SUMMARY**[**]

---

**Labor Law**

Affirming the district court's summary judgment in favor of the defendants, the en banc court held that the Railway Labor Act did not preempt a worker's claim premised on a state law right to reschedule vacation leave for family medical purposes, when the worker's underlying right to vacation leave was covered by a collective bargaining agreement.

---

[*] This case was submitted to a panel that included Judge Kozinski. Following Judge Kozinski's retirement, Judge Paez was drawn by lot to replace him.  *See* Ninth Cir. Gen. Order 3.2.h.  Judge Paez has read the briefs, reviewed the record, and listened to oral argument.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The en banc court held that the RLA did not preempt the worker's claim because the claim neither arose entirely from nor required construction of the CBA; that the CBA must be consulted to confirm the existence of accrued vacation days was not sufficient to extinguish the worker's independent state law right to use the accrued time to care for a sick child.

Dissenting, Judge Ikuta, joined by Judges Tallman, Callahan, Bea, and M. Smith, wrote that resolution of the state law claim required interpretation or application of the CBA, and the claim therefore constituted a "minor dispute" that must be resolved through the RLA's mandatory arbitral mechanism.

## COUNSEL

Mark A. Hutcheson (argued) and Rebecca Francis, Davis Wright Tremaine LLP, Seattle, Washington, for Plaintiff-Appellant.

Peter B. Gonick (argued), Deputy Solicitor General, Olympia, Washington; James P. Mills, Assistant Attorney General; Robert W. Ferguson, Attorney General; Office of the Attorney General, Tacoma, Washington; for Defendants-Appellees.

Kathleen Phair Barnard (argued), Schwerin Campbell Barnard Iglitzin & Lavitt LLP, Seattle, Washington for Intervenor-Defendant-Appellee.

**OPINION**

BERZON, Circuit Judge:

We are asked whether a claim premised on a state law right to reschedule vacation leave for family medical purposes is preempted by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–65, 181–88, when the worker's underlying right to vacation leave is covered by a collective bargaining agreement ("CBA"). We conclude that it is not.

The Supreme Court has repeatedly instructed that RLA preemption — like the "virtually identical" preemption under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185[1] — extends only as far as necessary to protect the role of labor arbitration in resolving CBA disputes. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 262–64 (1994); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988). Consistent with this precedent, we recognize RLA and LMRA § 301 preemption only where a state law claim arises entirely from or requires construction of a CBA. *Matson v. United Parcel Serv., Inc.*, 840 F.3d 1126, 1132–33 (9th Cir. 2016); *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1032–33 (9th Cir. 2016);

---

[1] Because the RLA and LMRA § 301 preemption standards are "virtually identical" in purpose and function, they are, for the most part, analyzed under a single test and a single, cohesive body of case law. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260, 262–63 & n.9 (1994). The one significant difference between RLA and LMRA § 301 preemption is that, under our case law, the latter, but not the former, gives rise to federal court jurisdiction under the "complete preemption" doctrine. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393–94 (1987); *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1244 (9th Cir. 2009); *see also infra* note 15.

*Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1060 (9th Cir. 2007). Neither condition applies here. That a CBA must be consulted to confirm the existence of accrued vacation days is not sufficient to extinguish an independent state law right to use the accrued time to care for a sick child.

**I**

In May 2011, Laura Masserant, a flight attendant for Alaska Airlines ("the Airline"), asked for time off to care for her son, who was sick with bronchitis. Masserant had no sick days available, so she asked to use two of her seven days of accrued vacation leave.

The Airline denied Masserant's request, noting that, in accordance with the CBA between the Airline and the Association of Flight Attendants ("the Union"), Masserant's banked vacation days had already been scheduled for use later in the year. Under the terms of the CBA, vacation days for each calendar year are requested the preceding fall and scheduled by January 1 for the ensuing year. Once scheduled, these vacation days may be "exchanged" between flight attendants, used for personal medical leaves of absence, used for maternity-related leaves of absence, used to extend bereavement leave, or "cashed out" — that is, paid out immediately, with the vacation days kept on calendar but converted to unpaid time off. However, the CBA does not allow scheduled vacation days to be moved for family medical reasons. Accordingly, Masserant's only option under the CBA was to take unscheduled leave to care for her son and so to incur disciplinary "points."

On June 21, 2011, Masserant filed a complaint with the Washington Department of Labor and Industries ("L&I"),

alleging that the Airline's refusal to allow use of banked vacation days violated the Washington Family Care Act ("WFCA"), Wash. Rev. Code § 49.12.270. The WFCA guarantees workers the flexibility to use accrued sick leave or other paid leave for family medical reasons. Workers invoking the WFCA must generally "comply with the terms of the [CBA] or employer policy applicable to the leave," except that they need not comply with terms or policies "relating to the choice of leave." Wash. Rev. Code § 49.12.270(1).[2]

The Airline opposed Masserant's WFCA claim on two grounds here relevant. First, it disputed L&I's jurisdiction. The Airline asserted that Masserant's complaint was not an ordinary state law claim but a CBA dispute in disguise, and therefore was reserved, under the RLA, to the exclusive

---

[2] The WFCA provides, in relevant part:

> If, under the terms of a collective bargaining agreement or employer policy applicable to an employee, the employee is entitled to sick leave or other paid time off, then an employer shall allow an employee to use any or all of the employee's choice of sick leave or other paid time off to care for: (a) A child of the employee with a health condition that requires treatment or supervision; or (b) a spouse, parent, parent-in-law, or grandparent of the employee who has a serious health condition or an emergency condition. An employee may not take advance leave until it has been earned. The employee taking leave under the circumstances described in this section must comply with the terms of the collective bargaining agreement or employer policy applicable to the leave, except for any terms relating to the choice of leave.

Wash. Rev. Code § 49.12.270(1).

jurisdiction of the CBA's grievance and arbitration mechanism. Second, the Airline disputed Masserant's view of the application of Washington law to the CBA's vacation leave provisions. According to the Airline, requiring adherence to the CBA's vacation-scheduling regime was not a prohibited restriction on "the choice of leave," Wash. Rev. Code § 49.12.270(1), but a permissible condition on earning leave in the first place.

The state agency sided with Masserant. The investigator responsible for Masserant's claim noted that it was undisputed that Masserant's banked vacation days were available as of May 2011 for exchange, personal medical leave, maternity-related leave, bereavement leave, or immediate cash-out. The leave was therefore "earned," and Masserant was "entitled" to use it, within the meaning of the WFCA. The investigator concluded that the CBA's limits on the use of banked vacation time, which could be used for certain other unscheduled purposes, served only to limit "the choice of leave," and were therefore void under state law. In May 2012, L&I issued a final notice of infraction and a $200 fine.

L&I did not directly address the Airline's jurisdictional argument. But in resting entirely on the interpretation and application of Washington law rather than on some disputed aspect of the CBA, L&I necessarily rejected the argument. As the Supreme Court held in *Norris*, RLA preemption does not apply where the state law claim can be resolved independently of any CBA dispute. *Norris*, 512 U.S. at 256–58; *see also Lingle*, 486 U.S. at 407 (describing the same standard in the LMRA § 301 context).

While the L&I proceeding was ongoing, the Airline was in the midst of federal litigation against L&I officials to enjoin it. That federal litigation, the genesis of the present appeal, asserted that Masserant's state law claim was so bound up in a dispute over the terms of the CBA as to be preempted under the Railway Labor Act.

Masserant was not a party to the federal action, but her Union intervened. In support of its intervention motion, the Union noted that if WFCA claims such as Masserant's were to be treated as CBA disputes, it would be largely the Union, rather than individual workers, that would have responsibility for pursuing those disputes through grievance and arbitration.[3] *See Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 49–52 (1979).

The district court concluded that Masserant's WFCA claim was unrelated to any dispute over the meaning of the CBA. It was common ground among the parties that Masserant had banked vacation days but was not permitted, under the terms of the CBA, to take them early for her son's medical care. The question was therefore purely one of state law — whether banked, prescheduled vacation days were subject to the state's nonnegotiable right to use accrued paid leave for family medical purposes. The Airline itself framed the inquiry in these terms at the L&I proceeding, arguing that "Masserant correctly sets out the approach outlined by the

---

[3] Section 20.A of the CBA "establishe[s] a Board of Adjustment for the purpose of adjusting and deciding [CBA] disputes." (Emphasis omitted). Section 20.D provides that "[t]he Board shall consider any dispute properly submitted to it by the [Master Executive Council] President of the Association of Flight Attendants . . . or by the [Airline]."

CBA and Alaska [Airlines] policy, but is wrong *in her WFCA analysis*." (Emphasis added).

Relying on a long line of RLA and LMRA § 301 cases from this circuit and the Supreme Court, the district court concluded that referring to undisputed CBA provisions in the course of adjudicating a state law cause of action was not enough to trigger RLA preemption. *See Livadas v. Bradshaw*, 512 U.S. 107, 124–25 (1994); *Lingle*, 486 U.S. at 407; *Burnside*, 491 F.3d at 1060. The court therefore denied the Airline's motion for summary judgment and granted the defendants' and Union's cross-motions.

On appeal, the Airline renews its argument that the RLA preempts Masserant's WFCA claim. A divided panel of this court agreed. The panel majority acknowledged that the terms of the CBA were undisputed. *Alaska Airlines Inc. v. Schurke*, 846 F.3d 1081, 1093 (9th Cir. 2017). But it held the state law cause of action nonetheless preempted "because the right to take paid leave arises solely from the collective bargaining agreement." *Id.* The panel majority reasoned that the WFCA "only applies if the employee has a right conferred by the collective bargaining agreement, so the state right is intertwined with . . . the collective bargaining agreement." *Id.*[4] A majority of active, nonrecused judges voted for en banc rehearing.

We review de novo the district court's conclusion that RLA preemption does not apply. *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 689 (9th Cir. 2001) (en

---

[4] The WFCA is not so limited. It applies both to workers covered by CBAs and to those covered by employer-established leave policies. *See supra* note 2.

banc), and affirm the judgment of the district court. Under both the RLA and LMRA § 301, federal preemption extends no further than necessary to preserve the role of grievance and arbitration, and the application of federal labor law, in resolving *CBA disputes*. That a state law cause of action is conditioned on some term or condition of employment that was collectively bargained, rather than unilaterally established by the employer, does not itself create a CBA dispute.

## II

We begin by reviewing the language of the RLA and the long line of cases explaining the purpose and scope of RLA and LMRA § 301 preemption.

## A

The RLA creates "a comprehensive framework for resolving labor disputes" in the rail and airline industries. *Norris*, 512 U.S. at 252. Within this framework, labor disputes are first categorized as "representation," "major," or "minor," according to their subject matter,[5] then assigned to a corresponding dispute-resolution mechanism. *See W. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1302–03 (1987) (O'Connor, J., in chambers).

"Representation" disputes concern the scope of the bargaining unit and the identity of the bargaining

---

[5] The RLA does not itself use the terms "major" or "minor." However, the terms were widely used to describe these two categories of dispute before the statute was enacted, *see Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945), and remain in common use.

representative. *Id.* at 1302. Under section 2, Ninth, of the RLA, representation disputes must be resolved by the National Mediation Board. *Id.* at 1302–03; *see also* 45 U.S.C. §§ 152, 181.

"Major" disputes are those "concerning rates of pay, rules, or working conditions." 45 U.S.C. § 151a; *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n* (*Conrail*), 491 U.S. 299, 302 (1989). "They arise where there is no [CBA] or where it is sought to change the terms of [an existing] one." *Conrail*, 491 U.S. at 302 (citation omitted). Major disputes must be resolved through an extensive bargaining, mediation, and noncompulsory arbitration process, in which both sides are subject to certain duties enforceable in federal court. 45 U.S.C. § 152, First, Seventh; *id.* §§ 156, 181; *Conrail*, 491 U.S. at 302.

Finally, "minor" disputes are those "growing out of grievances or . . . the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a; *Conrail*, 491 U.S. at 303. They are, in other words, CBA disputes, for which the term "grievance" is often used as a generic descriptor. *Norris*, 512 U.S. at 255; *see also Conrail*, 491 U.S. at 302 ("[M]ajor disputes seek to create contractual rights, minor disputes to enforce them."). Minor disputes must be addressed through the CBA's established grievance mechanism, and then, if necessary, arbitrated before the appropriate adjustment board.[6]  45 U.S.C. § 152, Sixth; *id.* §§ 153, 184.

---

[6] Minor disputes in the rail industry are arbitrated before the National Rail Adjustment Board. *See* 45 U.S.C. § 153, First. When the RLA was extended to the airline industry in 1936, Congress provided for the possibility of a National Air Transport Adjustment Board, *see* 45 U.S.C.

Like the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151–69, and the LMRA, 29 U.S.C. §§ 141–97, the RLA contains no express preemption language. *See Air Transp. Ass'n of Am. v. City & County of San Francisco*, 266 F.3d 1064, 1076 (9th Cir. 2001). Preemption is instead implied as necessary to give effect to congressional intent, *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208–11 (1985), subject to the critical caveat that the "[p]re-emption of employment standards within the traditional police power of the State should not be lightly inferred," *Norris*, 512 U.S. at 252 (internal quotation marks omitted).

Congress's intent in passing the RLA was to promote industrial peace by providing a "comprehensive" scheme for resolving labor disputes "through negotiation rather than industrial strife." *Norris*, 512 U.S. at 252; *Bowen v. U.S. Postal Serv.*, 459 U.S. 212, 225 (1983); *see* 45 U.S.C. § 151a. As in the LMRA context,[7] the arbitration of CBA disputes in

---

§ 185, but no such body was ever formed. Instead, minor disputes arising in the airline industry are arbitrated before the specific "system board of adjustment" set up by each airline industry CBA. *See Conrail*, 491 U.S. at 304 n.4.

[7] The source of the obligation to arbitrate differs between the RLA and the LMRA. The RLA creates the obligation, providing for CBA disputes to be resolved through grievance and arbitration, and requiring "adjustment boards" to be created for the arbitration. 45 U.S.C. §§ 153, 184; *see also Union Pac. R.R. Co. v. Price*, 360 U.S. 601, 610–11 (1959) (explaining the origins of the RLA's grievance and arbitration mandate). LMRA § 301, on the other hand, protects contractually created obligations. It provides, as a matter of federal common law, for the specific performance of CBA terms requiring the grievance and arbitration of disputes. *Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 450–51 (1957); *see also Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962). Such terms are not mandated by statute. But as,

RLA-covered industries — "minor disputes," in RLA terms — is an essential component of federal labor policy. *See United Steelworkers v. Warrior & Gulf Navigation Co.* (*Steelworkers II*), 363 U.S. 574, 578 (1960). The reasons are threefold.

First, a collective bargaining agreement is more than just a contract; it is "an effort to erect a system of industrial self-government." *Id.* at 580; *see also California v. Taylor*, 353 U.S. 553, 565–66 (1957). A CBA sets forth "a generalized code to govern . . . the whole employment relationship," including situations "which the draftsmen [could not] wholly anticipate." *Steelworkers II*, 363 U.S. at 578–79. Accordingly, CBA dispute resolution is itself a part of a "continuous collective bargaining process," *United Steelworkers v. Enter. Wheel & Car Corp.* (*Steelworkers III*), 363 U.S. 593, 596 (1960) — "a vehicle by which meaning and content are given" to the labor agreement, *Steelworkers II*, 363 U.S. at 581. To set aside the parties' grievance and arbitration process is to undo an integral part of the workplace self-governance scheme. *Id.* at 578; *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969); *see also Conrail*, 491 U.S. at 310–11.

Second, and relatedly, a CBA is not strictly limited to its terms, but gives rise to a broader common law of its own — "the common law of a particular industry or of a particular

---

in practice, "[a]rbitrators are delegated by nearly all [CBAs] as the adjudicators of contract disputes," *Lingle*, 486 U.S. at 411 n.11, the end purposes of LMRA § 301 preemption and RLA preemption are the same — to enforce "a central tenet of federal labor-contract law . . . that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Lueck*, 471 U.S. at 220.

plant." *Steelworkers II*, 363 U.S. at 579. The resolution of CBA disputes may therefore "assume proportions of which judges are ignorant." *United Steelworkers v. Am. Mfg. Co.* (*Steelworkers I*), 363 U.S. 564, 567 (1960); *see also Conrail*, 491 U.S. at 311–12. For example, the resolution of CBA disputes may be informed by ad hoc considerations — "the effect upon productivity of a particular result, its consequence to the morale of the shop, . . . whether tensions will be heightened or diminished," *Steelworkers II*, 363 U.S. at 582 — which a judge may lack the expertise properly to balance.

Third, grievance and arbitration are believed to provide certain procedural benefits, including a more "prompt and orderly settlement" of CBA disputes than that offered by the ordinary judicial process. 45 U.S.C. § 151a. In committing CBA disputes to an adjustment board, a worker "receive[s] a final administrative answer to his dispute; and if he wins, he will be spared the expense and effort of time-consuming appeals which he may be less able to bear than the [employer]." *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978) (per curiam). The intended result is to prevent an "[a]ccumulation of [minor] disputes," *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 40 (1957), and so to "diminish the risk of interruptions in commerce." *Conrail*, 491 U.S. at 311.

To account for these considerations, the Supreme Court has held that RLA and LMRA grievance and arbitration systems must be used for claims arising under the CBA. *See Air Transp. Ass'n*, 266 F.3d at 1076 (citing *Taylor*, 353 U.S. at 559–61). Minor disputes under the RLA — those disputes concerned with "duties and rights created or defined by" the collective bargaining agreement, *Norris*, 512 U.S. at 258 — "must be resolved only through the RLA mechanisms." *Id.*

at 253; *see also Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 563 (1987). To the extent state law would also create a cause of action for a minor dispute, and thereby "permit[] an individual to sidestep available grievance procedures," the state law action is preempted. *Lingle*, 486 U.S. at 411.

Such limited preemption has other benefits as well. In particular, it ensures that CBA disputes are governed by a uniform set of principles informed by federal labor law and the industrial common law applicable to the agreement, *id.* at 405–06, rather than "conflicting substantive interpretation under competing [state] legal systems." *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962); *see also Republic Steel Corp. v. Maddox*, 379 U.S. 650, 654–57 (1965); *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*, 372 U.S. 682, 691–95 & nn. 17–18 (1963). "[T]he application of state law" to CBA disputes "might lead to inconsistent results since there could be as many state-law principles as there are States." *Lingle*, 486 U.S. at 406; *see also Norris*, 512 U.S. at 263 & n.9.

At the same time — and of critical importance here — the RLA does *not* provide for, nor does it manifest any interest in, national or systemwide uniformity in substantive labor rights.[8] *See Buell*, 480 U.S. at 565. "[T]he enactment by Congress of the Railway Labor Act was not a pre-emption of the field of regulating working conditions themselves . . . ."

---

[8] The National Mediation Board has determined that the RLA allows certification of unions only where they "represent the majority of a system-wide class of employees." *Summit Airlines, Inc. v. Teamsters Local Union No. 295*, 628 F.2d 787, 795 (2d Cir. 1980); *see* 45 U.S.C. § 152, Ninth.

*Terminal R.R. Ass'n of St. Louis v. Bhd. of R.R. Trainmen*, 318 U.S. 1, 7 (1943). Setting minimum wages, regulating work hours and pay periods, requiring paid and unpaid leave, protecting worker safety, prohibiting discrimination in employment, and establishing other worker rights remains well within the traditional police power of the states, and will naturally result in labor standards that affect workers differently from one jurisdiction to the next, even when those workers fall under a single labor agreement. *See Norris*, 512 U.S. at 262–63.

Stated differently, it is not a concern of the RLA that the employer's operations may be affected by its obligation to comply with a different set of substantive state law rights in each jurisdiction. The purpose of RLA minor dispute preemption is to reduce commercial disruption by "facilitat[ing] collective bargaining and . . . achiev[ing] industrial peace," *Foust*, 442 U.S. at 47, not to reduce burdens on an employer by federalizing all of labor and employment law so as to preempt independent state law rights. For RLA-covered workers, as for LMRA-covered workers, "it would be inconsistent with congressional intent . . . to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Lueck*, 471 U.S. at 212.

It follows from the RLA minor dispute provision's focus on grieving and arbitrating *CBA disputes* that Congress did not intend to preempt state law claims simply because they in some respect implicate CBA provisions, *Lueck*, 471 U.S. at 211, make reference to a CBA-defined right, *Livadas*, 512 U.S. at 125, or create a state law cause of action factually "parallel" to a grievable claim, *Lingle*, 486 U.S. at 408–10. Rather, "an application of state law is pre-empted . . . only if

such application requires the interpretation of a collective-bargaining agreement.'"[9]  *Id.* at 413.  In sum, RLA minor dispute preemption and LMRA § 301 preemption protect the primacy of grievance and arbitration as the forum *for resolving CBA disputes* and the substantive supremacy of federal law within that forum, nothing more.  *Norris*, 512 U.S. at 262–63.

## B

In evaluating RLA or LMRA § 301 preemption, we are guided by the principle that if a state law claim "is either grounded in the provisions of the labor contract or requires interpretation of it," the dispute must be resolved through grievance and arbitration.[10]  *Burnside*, 491 F.3d at 1059.  The line "between preempted claims and those that survive" is not one "that lends itself to analytical precision."  *Cramer*, 255 F.3d at 691.  This circuit, however, has distilled the Supreme Court's RLA and LMRA § 301 case law into a two-part inquiry into the nature of a plaintiff's claim.  *Matson*, 840 F.3d at 1132–33; *Kobold*, 832 F.3d at 1032–34; *Burnside*, 491 F.3d at 1059–60.[11]

---

[9] As only minor dispute preemption is at issue in this case, we refer to "RLA preemption" and "RLA minor dispute preemption" interchangeably.

[10] The same principle applies to federal law claims, although they might better be described as "precluded."  *See Buell*, 480 U.S. at 563–65 & n.10.

[11] The panel majority concluded that the *Burnside* test was inapplicable to the present case because *Burnside* dealt with a state law right from which workers could opt out if the CBA so provided.  *Schurke*, 846 F.3d at 1090–91.  The panel majority misread *Burnside*.  There, we

*First*, to determine whether a particular right is grounded in a CBA, we evaluate the "legal character" of the claim by asking whether it seeks purely to vindicate a right or duty created by the CBA itself. *Livadas*, 512 U.S. at 123. If a claim arises entirely from a right or duty of the CBA — for example, a claim for violation of the labor agreement, whether sounding in contract or in tort,[12] *Lueck*, 471 U.S. at 211 — it is, in effect, a CBA dispute in state law garb, and is preempted. *Livadas*, 512 U.S. at 122–23. In such cases, the CBA is the "only source" of the right the plaintiff seeks to vindicate. *Norris*, 512 U.S. at 258 (quoting *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 324 (1972)). There is thus no part of the claim that "do[es] not require construing [the] collective-bargaining agreement[]," *Lingle*, 486 U.S. at 411, and as to which litigation in court, rather than though the grievance and arbitration system, would be appropriate. *See Steelworkers I*, 363 U.S. at 568. For the same reason, there is no part of the claim in which the uniform body of federal labor law does not control the

_____

did not address the distinction between state law rights that are opt-in, opt-out, or nonnegotiable in explaining the general test for LMRA § 301 preemption; we addressed the distinction in explaining the *result* we reached, after applying the generally applicable two-step test. *See Burnside*, 491 F.3d at 1060–64. *Burnside* has been repeatedly so construed. *See Matson*, 840 F.3d at 1132; *Kobold*, 832 F.3d at 1033. To the extent there remains any doubt, we here reject the panel majority's misinterpretation of *Burnside* and reiterate the general applicability of the two-step inquiry described.

[12] Breach-of-contract claims are the paradigmatic example. However, as the Supreme Court has recognized, RLA and LMRA § 301 preemption must extend beyond breach-of-contract claims, as "[a]ny other result would elevate form over substance and allow parties to evade [grievance and labor arbitration] by relabeling their contract claims as claims for tortious breach of contract." *Lueck*, 471 U.S. at 211.

resolution of the parties' dispute. *See Maddox*, 379 U.S. at 654–57; *Cent. Airlines*, 372 U.S. at 691–95 & nn. 17–18; *Lucas Flour*, 369 U.S. at 104.

By contrast, claims are not simply CBA disputes by another name, and so are not preempted under this first step, if they just refer to a CBA-defined right, *Livadas*, 512 U.S. at 125; rely in part on a CBA's terms of employment, *Lueck*, 471 U.S. at 211; run parallel to a CBA violation, *Lingle*, 486 U.S. at 408–10; or invite use of the CBA as a defense, *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398 (1987). *See also Kobold*, 832 F.3d at 1032; *Burnside*, 491 F.3d at 1060.

*Second*, if a right is *not* grounded in a CBA in the sense just explained, we ask whether litigating the state law claim nonetheless requires interpretation of a CBA, such that resolving the entire claim in court threatens the proper role of grievance and arbitration. *Norris*, 512 U.S. at 262; *Livadas*, 512 U.S. at 124–25. "Interpretation" is construed narrowly; "it means something more than 'consider,' 'refer to,' or 'apply.'" *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108 (9th Cir. 2000).[13] Accordingly, at this second step of an RLA or LMRA § 301 preemption analysis, claims are only preempted to the extent there is an active dispute over "the meaning of contract terms." *Livadas*, 512 U.S. at 124. "[A] *hypothetical* connection between the claim and the terms of the CBA is not enough to preempt the

---

[13] As in *Balcorta*, we here use the term "apply" in the sense of applying the plain or undisputed terms of the CBA. *See Balcorta*, 208 F.3d at 1110–11; *see also Lingle*, 486 U.S. at 410 ("[A]s long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement . . . ."). Although a claim for breach of the CBA might be framed as "applying" the CBA, that sort of dispute over CBA "application" would be preempted under step one.

claim . . . ." *Cramer*, 255 F.3d at 691 (emphasis added). Nor is it enough that resolving the state law claim requires a court to refer to the CBA and apply its plain or undisputed language — for example, "to discern that none of its terms is reasonably in dispute," *id.* at 692 (quoting *Livadas*, 512 U.S. at 125); to identify "bargained-for wage rates in computing [a] penalty," *Livadas*, 512 U.S. at 125; or "to determine whether [the CBA] contains a clear and unmistakable waiver of state law rights," *Cramer*, 255 F.3d at 692. *See also Kobold*, 832 F.3d at 1033.

Notably, the result of preemption at the second step is generally *not* the extinguishment of the state law claim. *Kobold*, 832 F.3d at 1033–34. As previously explained, neither the RLA nor the LMRA allows for the impairment of worker rights that would exist in the absence of a CBA dispute. *Norris*, 512 U.S. at 256, 262–63. It is contrary to the statutes' scope to allow "the parties to a collective-bargaining agreement . . . to contract for what is illegal under state law," *Lueck*, 471 U.S. at 212, or to "penalize[] workers who have chosen to join a union by preventing them from benefiting from state labor regulations imposing minimal standards on nonunion employers." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985); *see also* 45 U.S.C. § 151a (stating, as a purpose of the RLA, "to forbid any limitation upon freedom of association among employees"). As a result, if, at the second stage of the analysis, a state law claim depends on a dispute over the meaning of a CBA, it is only "to that degree preempted." *Kobold*, 832 F.3d at 1036; *see also Matson*, 840 F.3d at 1135. That is, state law claims are preempted by the RLA or LMRA § 301 "only insofar as resolution of the state-law claim requires the interpretation of

a collective-bargaining agreement."[14] *Lingle*, 486 U.S. at 409 n.8; *see also Livadas*, 512 U.S. at 124 n.18.

As this two-step preemption inquiry suggests, RLA and LMRA § 301 preemption differ from typical conflict preemption because they are not driven by substantive conflicts in law. Rather, RLA and LMRA § 301 preemption are grounded in the need to protect the proper *forum* for resolving certain kinds of disputes (and, by extension, the substantive law applied thereto). RLA and LMRA § 301 preemption are, in effect, a kind of "forum" preemption, resembling the doctrine of primary jurisdiction or the reference of disputes to arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1–16.

In considering primary jurisdiction, for example, a court's goal is not to ascertain the substance of applicable law, but to ensure that "an administrative body having regulatory authority" that "requires expertise or uniformity in administration" is permitted to resolve the issues that Congress committed to it. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (internal quotation marks omitted). Similarly, in the arbitrability context, a court's responsibility is to ascertain the subject matter or posture of the dispute to determine the proper forum for resolving it. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). RLA and LMRA § 301

---

[14] So, for example, if addressing a state law claim first requires resolving a dispute over CBA interpretation, resolving that dispute — through grievance, through labor arbitration, or through settlement — should allow the state law claim to proceed. *See, e.g.*, *Matson*, 840 F.3d at 1135 (concluding that "even if any interpretation of the CBA had been required," it was addressed by earlier grievance settlements and therefore was not a basis for LMRA § 301 preemption).

preemption are analogous.  The court's role is not to resolve the labor dispute, but to protect the role of grievance and arbitration as a forum for doing so to the extent that forum's unique area of competency — CBA disputes — is at issue.[15]

The parallels are more than superficial.  For one, the result of RLA and LMRA § 301 forum preemption is not to preempt state laws as such, but to assure that discrete *claims* are decided in the appropriate forum.  *Caterpillar*, 482 U.S. at 394 ("Section 301 governs claims . . . ."); *see also, e.g.*, *Norris*, 512 U.S. at 266 ("[R]espondent's *claims* for discharge in violation of public policy and in violation of the Hawaii

---

[15] The dissent treats *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004), as ruling out the possibility of a forum preemption analysis of this kind.  But *Davila* has nothing to do with the subject of the RLA or LMRA § 301 preemption analysis — the protection of a nonjudicial forum.  The statute at issue in *Davila*, the Employee Retirement Income Security Act ("ERISA"), provides for no such alternative forum.

Moreover, *Davila* deals only with "complete preemption," which, despite its name, "is actually a doctrine of jurisdiction and is not to be confused with ordinary preemption doctrine." *Balcorta*, 208 F.3d at 1107 n.7; *see also Caterpillar*, 482 U.S. at 393.  According to *Davila*, section 502(a) of ERISA, like section 301 of the LMRA, has such strong preemptive force that it justifies an exception to the well-pleaded complaint rule.  *Davila*, 542 U.S. at 209.  ERISA preemption defenses, like LMRA § 301 defenses, are therefore valid grounds for removal.  *Id.* at 207–08.  Unlike ERISA (or the LMRA), the RLA is not a source of complete preemption, as it "does not provide a federal cause of action." *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1245–46 (9th Cir. 2009) (quoting 15 Moore's Federal Practice § 103.45(3)(b) (3d ed. 2008); *see also Hughes v. United Air Lines, Inc.*, 634 F.3d 391, 394–95 (7th Cir. 2011), *cert. denied*, 565 U.S. 819; *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 274–75 (2d Cir. 2005); *Roddy v. Grand Trunk W. R.R. Inc.*, 395 F.3d 318, 326 (6th Cir. 2005); *Geddes v. Am. Airlines, Inc.*, 321 F.3d 1349, 1356–57 (11th Cir. 2003), *cert. denied*, 540 U.S. 946.

Whistleblower Protection Act are not pre-empted by the RLA . . . ." (emphasis added)); *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 (1987) ("[W]e must determine if respondent's *claim* is sufficiently independent of the collective-bargaining agreement . . . ." (emphasis added)); *Humble v. Boeing Co.*, 305 F.3d 1004, 1008 (9th Cir. 2002) ("[T]he plaintiff's *claim* is the touchstone for the preemption analysis . . . ." (emphasis added)). The primary point of reference in the preemption analysis is therefore not state law writ large — no state law is "challenged" under RLA or LMRA § 301 preemption, nor is any state law at risk of wholesale invalidation — but the plaintiff's pleading. *See Espinal v. Nw. Airlines*, 90 F.3d 1452, 1456 (9th Cir. 1996) ("*Where a plaintiff contends* that an employer's actions violated rights protected by the CBA, there is a minor dispute subject to RLA preemption. By contrast, *where a plaintiff contends* that an employer's actions violated a state-law obligation, wholly independent of its obligations under the CBA, there is no preemption." (emphases added) (citation omitted)).[16]

---

[16] *See also, e.g.*, *United Steelworkers v. Rawson*, 495 U.S. 362, 371 (1990) ("As we see it . . . , respondents' tort claim cannot be described as independent of the collective-bargaining agreement. This is not a situation where the Union's delegates are accused of acting in a way that might violate the duty of reasonable care owed to every person in society. There is no allegation, for example, that members of the safety committee negligently caused damage to the structure of the mine . . . ."); *Hechler*, 481 U.S. at 861 ("In her complaint, respondent alleges . . . [a] type of [preempted] tortious breach-of-contract claim. She asserts that . . . the Union owed respondent a duty of care to ensure her a safe working environment. Having assumed this duty under the collective-bargaining agreement, the Union — according to the complaint — was then negligent . . . ." (citation omitted)).

Furthermore, the RLA and LMRA § 301 forum preemption inquiry is not an inquiry into the merits of a claim; it is an inquiry into the claim's "legal character" — whatever its merits — so as to ensure it is decided in the proper forum. *Livadas*, 512 U.S. at 123–24. In conducting the preemption analysis, we may no more invade the province of the state court to resolve a state law claim over which we lack jurisdiction than we may invade the province of the labor arbitrator to construe the CBA.[17]  *See Steelworkers III*, 363 U.S. at 599.  Our only job is to decide whether, as pleaded, the claim "in this case is 'independent' of the [CBA] in the sense of 'independent' that matters for . . . pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement." *Lingle*, 486 U.S. at 407.

The distinction between RLA and LMRA § 301 preemption (as an inquiry into the proper forum for resolving a claim) and the more common application of conflict preemption (as an inquiry into substantive conflicts between state and federal law) is widely recognized across the circuits. *See, e.g.*, *Smith v. Am. Airlines, Inc.*, 414 F.3d 949, 952 (8th

---

[17] Ordinarily, RLA and LMRA § 301 preemption claims are made defensively, by an employer seeking the dismissal of a claim brought in or removed to federal court.  In such cases, a federal court finding no preemption may, if it otherwise has jurisdiction, go on to resolve the merits.  Here, however, the Airline raised RLA preemption offensively, in a federal action in which our jurisdiction is strictly limited to the preemption analysis.  The parties do not cite, nor have we uncovered, a similar offensive RLA or LMRA § 301 preemption case, in which the intended subject of the federal injunction is an ongoing state agency or state court proceeding.  But the defendants have raised no procedural objection to our authority to decide the present case.  *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79–80 (2013); *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1271–72 (9th Cir. 1994).

Cir. 2005) ("[M]inor disputes are subject to mandatory arbitration before an adjustment board which has primary jurisdiction to construe the collective bargaining agreement."); *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 276 (2d Cir. 2005) ("[P]rimary jurisdiction over minor disputes under the RLA . . . exists solely in the adjustment boards established pursuant to [the RLA]."); *Renneisen v. Am. Airlines, Inc.*, 990 F.2d 918, 923 (7th Cir. 1993) ("[T]he RLA mandates a statutory forum for plaintiffs' claims."); *Davies v. Am. Airlines, Inc.*, 971 F.2d 463, 465 n.1 (10th Cir. 1992) ("By [RLA] 'preemption' we refer to forum preemption."); *Ry. Labor Execs. Ass'n v. Pittsburgh & Lake Erie R.R. Co.*, 858 F.2d 936, 944 (3d Cir. 1988) ("[F]orum preemption under the RLA may ultimately affect the litigation of this case."); *Miller v. Norfolk & W. Ry. Co.*, 834 F.2d 556, 561 (6th Cir. 1987) ("[A] state claim which is preempted by the RLA, as by the NLRA under *Garmon*, is instead preempted under a choice of forum analysis.").

The Supreme Court further clarified the distinction in *Livadas*. There, a worker subject to a CBA filed a complaint with the California Division of Labor Standards Enforcement ("DLSE"), seeking damages under a state statute requiring the immediate payment of past wages upon termination. *Livadas*, 512 U.S. at 111–12. DLSE refused to consider the complaint, citing the worker's CBA. *Id.* at 112–13. At the time, DLSE had a policy of refusing to consider state law labor complaints that involved a CBA in some way. *Id.* at 112–14, 121.

In deciding against DLSE, the Supreme Court made two distinct observations about two distinct preemption doctrines. First, the Supreme Court noted that nothing about the worker's claim implicated LMRA § 301 preemption.

Although the worker was owed wages based on having worked under a CBA, and although the CBA determined the amount of those wages, the CBA did not create the right to immediate payment on termination. *Id.* at 124–25 ("The only issue raised by Livadas's claim . . . was a question of state law . . . ."). Nor was any disputed term of the CBA implicated in the adjudication of that state law right. *Id.* at 125 (observing that, although CBA-defined wages were used to calculate damages under the Labor Code, "[t]here is no indication that there was a 'dispute' in this case over the amount" of wages owed under the CBA). The claim was therefore well within DLSE's authority to adjudicate.

Second, and separately, the Supreme Court concluded that DLSE's policy of refusing to consider state law complaints involving a CBA was subject to substantive conflict preemption, as the policy uniquely disfavored CBA-covered workers, and thus interfered with substantive federal rights under the NLRA. 29 U.S.C. § 157; *Livadas*, 512 U.S. at 116–17 & n.11. The NLRA protects the right "to bargain collectively through representatives of [workers'] own choosing." 29 U.S.C. § 157. Accordingly, DLSE's policy was preempted substantively to the extent there existed, "rooted in the text of [the NLRA]," a right to bargain without the state imposing penalties on workers if they ultimately

reached and became bound by a labor agreement.[18]  *Livadas*, 512 U.S. at 117 n.11.

The differences between LMRA § 301 preemption (and so RLA preemption) and ordinary, substantive conflict preemption, as the Court employed the doctrines in *Livadas*, are significant.  With respect to LMRA § 301 preemption, the Court considered the worker's claim based on her complaint before DLSE, concluded the claim was not extinguished, and noted that a different result could obtain in a differently pleaded claim under the same state statute.  *Id.* at 121–25 & n.19.  The focus was thus the plaintiff's pleading, the character of the claim, and the proper forum to resolve that claim.  With respect to substantive conflict preemption under the NLRA, the Court looked at the state law as the state applied it, concluded that the rule of law applied by the state was substantively in conflict with federal law, and invalidated it wholesale.  *Id.* at 128–32.  The focus was thus the meaning of state law and its consistency with federal law.  The two analyses — procedural and substantive — were not conflated in *Livadas* and should not be conflated here.  *See also Air Transp. Ass'n*, 266 F.3d at 1076 (distinguishing RLA minor

---

[18] The Court concluded, in the alternative, that the DLSE policy was subject to *Machinists* preemption.  *Machinists* preemption is another, more specific application of substantive conflict preemption under the NLRA. It applies where state law attempts to regulate areas intentionally left "to be controlled by the free play of economic forces," so as to "preserve[] Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests."  *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 225–26 (1993) (internal quotation marks omitted); *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n*, 427 U.S. 132 (1976).

dispute preemption from "substantive" conflict preemption as applied in the RLA context, and observing that the latter "is analogous to *Machinists* preemption under the NLRA").

It is perhaps because of the risk of such confusion that labor law preemption is rarely described as an undifferentiated application of the "field" or "conflict" preemption that governs in other substantive areas, *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 & n.6 (2000), but rather by identifying the particular *species* of labor preemption — *Garmon* preemption,[19] *Machinists* preemption,[20] RLA or LMRA § 301 preemption — relevant to the parties' dispute, based on the federal labor law interests ostensibly under threat in a given case. *See, e.g.*, *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224 (1993); *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners*, 768 F.3d 938, 951–55 (9th Cir. 2014). But as in *Livadas*, what matters in a preemption analysis is not the nomenclature; what matters is "[t]he purpose of Congress," which is "the ultimate touchstone." *Lueck*, 471 U.S. at 208 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504

---

[19] *See San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 245 (1959) (holding that "the States as well as the federal court must defer to the exclusive competence of the National Labor Relations Board" if "an activity is arguably subject to § 7 or § 8 of the [NLRA]").

[20] *See Int'l Ass'n of Machinists & Aerospace Workers*, 427 U.S. at 145–48 (holding that state law is preempted where it would upset the congressionally defined balance of power between management and labor by regulating activity Congress deliberately left unregulated); *see also Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 (1986).

(1978)).  In the RLA and LMRA § 301 context, the "purpose of Congress" is to protect the role of grievance and arbitration and of federal labor law in resolving CBA disputes, not to alter or displace state law labor rights.  *Norris*, 512 U.S. at 256; *Lingle*, 486 U.S. at 408–09; *Maddox*, 379 U.S. at 654–57; *Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, Peoria & W. R.R.*, 321 U.S. 50, 58 (1944).  The preemption analysis is targeted accordingly — not to the substance of state law or the merits of the parties' dispute, but to the "legal character" of the claim asserted.  *Livadas*, 512 U.S. at 123.  To the extent a plaintiff's state law claim can be resolved without infringing on the role of grievance and arbitration, there is no "conflict" to speak of, and the preemption analysis ends.

## C

Having identified the correct approach to RLA preemption, applying it in this case is straightforward.

*First*, Masserant's claim does not arise entirely from the CBA.  Masserant has alleged a violation of the WFCA's independent state law right to use banked vacation days.  Her view of the WFCA, and that of the L&I, is that the statute's "choice of leave" exception applies to banked vacation already earned, even if under workplace practices (whether CBA-governed or not) prescheduled vacation may be rescheduled or used for exigencies only under specified circumstances.  Unsurprisingly, the Airline disagrees with this interpretation of the WFCA.  And after further administrative or state court review, the Airline may yet prevail in its view of Washington law.  *See* Wash. Admin. Code § 296-130-070 (describing the administrative appeal process at L&I).  But what matters here is not the legal merits

of Masserant's state law claim, but that Masserant's claim invokes a state law right that applies to all workers, whether CBA-covered or not, and gives rise to a state law dispute, not a dispute concerning the meaning of the CBA.

*Second*, whatever the correct interpretation of Washington law, Masserant's claim does not require construction of the CBA. The claim of course *relies on* the terms and conditions of employment established by the CBA, in that Masserant's banked vacation days exist only by virtue of her having earned them in accordance with a workplace policy incorporated in the CBA. And the claim may be aided by *reference to* certain other CBA provisions, such as those making banked vacation immediately available for exchange, personal medical leave, maternity leave, bereavement leave, or cash-out. *See Livadas*, 512 U.S. at 125. But reliance on and reference to CBA-established or CBA-defined terms of employment do not make for a CBA dispute if there is no disagreement about the meaning or application of any relevant CBA-covered terms of employment. *See id.* (rejecting preemption where the calculation of damages depended on the CBA's undisputed wage provisions); *Burnside*, 491 F.3d at 1072 (citing examples of employers attempting to manufacture preemption by invoking CBA disputes unrelated to the resolution of the claims at issue).

In this case, the meaning of every relevant provision in the CBA is agreed upon. Most importantly, the parties agree that Masserant did, in fact, have seven days of banked vacation, which she could also have chosen to use for a number of exigent, unscheduled purposes, such as

bereavement or personal medical leave.[21] The Airline argues that a dispute exists over whether Masserant truly "earned" her vacation and was "entitled" to take it within the meaning of the WFCA. But those terms, as here relevant, are contained within the WFCA, not the CBA. *See* Wash. Rev. Code § 49.12.270(1). A dispute over their meaning is a dispute over state law, and therefore outside the scope of the "minor disputes" to which an RLA system adjustment board is limited. *See* 45 U.S.C. § 184; *Norris*, 512 U.S. at 254–55. "[T]he construction of the [CBA] is simply not involved." *Valles v. Ivy Hill Corp.*, 410 F.3d 1071, 1082 (9th Cir. 2005). If the state agency or state courts ultimately decide that the Airline is correct about the meaning of the WFCA, Masserant will not have been entitled to use her seven banked vacation days to care for her sick child, and she will lose without regard to any construction of the CBA; if Masserant is correct about the meaning of the WFCA, the remedies accorded by state law will be available, and she will win without regard to any construction of the CBA.

At oral argument, the Airline suggested that the Union was separately seeking to have the CBA reinterpreted to allow for the rescheduling of vacation leave for family medical purposes. But it does not matter for present purposes whether the Union, or a worker, may in a separate grievance proceeding pursue the theory that the CBA does allow rescheduling vacation leave for family medical reasons. A state law right to flexibility in rescheduling vacation leave for

---

[21] In light of the numerous undisputed options for repurposing advance-scheduled leave, the Airline's professed concern for the predictability of its schedules — irrelevant in any event for the purposes of an RLA preemption analysis, *see Buell*, 480 U.S. at 565 — is somewhat overstated.

family medical reasons is no less independent of the CBA if the CBA also provides that right on its own. The fact that "a CBA provides a remedy or duty related to a situation that is *also* directly regulated by non-negotiable state law does not mean the employee is limited to a claim based on the CBA." *Humble*, 305 F.3d at 1009; *see Norris*, 512 U.S. at 261; *Lingle*, 486 U.S. at 412–13. What matters for present purposes, in other words, is that Masserant can prevail if state law means what L&I has already concluded it means, whether or not the Airline's CBA interpretation is correct.[22]

In sum, the requisites of RLA preemption do not exist in this case. Masserant is entitled to pursue her state law remedies, if any, before the state agency and in state courts, as state law provides.

### D

The dissent advocates a version of preemption for which no authority exists in the RLA minor dispute or LMRA § 301 context, for which no party has argued,[23] and which neither the district court nor the three-judge panel so much as

---

[22] At oral argument, the Union disavowed any interest in labor arbitration on Masserant's behalf over the possibility of a CBA-created right to reschedule accrued vacation leave. The Union, as the workers' representative, is the party responsible under the CBA for pursuing a worker's claim in labor arbitration. *Bowen*, 459 U.S. at 225–26 & n.14; *supra* note 3.

[23] The Airline disavowed the dissent's reading of the RLA both in its briefing and at oral argument. L&I and the Union took the same position.

mentioned.[24] The court's first task, according to the dissent, is to construe state law and resolve all disputes between the parties as to its meaning. *Only then* would we consider who has the authority to resolve the parties' dispute — at that point, a seemingly futile endeavor.

The practical consequences of the dissent's approach are disturbing. As we have emphasized, RLA preemption presents, at bottom, a question of forum. But the dissent would begin its analysis by rejecting Masserant's state law claim, and would thus usurp the role of the state forum from the outset. The dissent would do so in the name of conflict preemption, even though there is no possible interpretation of the WFCA that would create a substantive "conflict" with the RLA, as the RLA has no bearing on substantive state law rights. *Norris*, 512 U.S. at 254. And the dissent would conclude — notwithstanding a state agency ruling to the contrary, our lack of jurisdiction over the underlying claim,

---

[24] *Schurke*, 846 F.3d at 1085 ("The issue before us is not whether Masserant is entitled to use her vacation leave, scheduled for December, in May, to care for her sick child. Though that is what the case is all about, it is not the issue posed for us. The issue before us is . . . whether the state administrative board or the [CBA] grievance procedure ought to decide . . . ."); *Alaska Airlines, Inc. v. Schurke*, No. C11-0616JLR, 2013 WL 2402944, at *7 (W.D. Wash. May 31, 2013) ("The court need not determine whether Alaska's restrictions on the use of banked vacation time violated the WFCA and does not reach the merits of that issue. It is sufficient that a court could determine that the WFCA independently guaranteed Ms. Masserant the right to use her accrued leave, whatever the source, for family leave.").

and Masserant's absence from the present action — that Masserant's interpretation of state law is invalid. The dissent would then enjoin any further consideration of Masserant's WFCA claim by the state agency, thereby barring the only body with jurisdiction over Masserant's state law claim from resolving it.[25] As to Masserant, the end result is to force her into a CBA-based claim absent from her complaint and disclaimed by her legal representative. *Cf. Caterpillar*, 482 U.S. at 394–95 ("It is true that respondents . . . possessed substantial rights under the collective [bargaining] agreement, and could have brought suit under [the LMRA]. As masters of the complaint, however, they chose not to do so."). More broadly, the end result is a break from any conventional understanding of our federal system: The dissent would use the RLA to enjoin the state agency from interpreting and applying state law, thus allowing a federal court effectively to police the development of substantive state law, and inhibiting the state from creating precedent on the meaning of its own statutes through the ordinary process of state court appeals.

The dissent would presumably allow the state to administer its own law if a WFCA claim were brought by a worker *not* covered by a CBA. This special treatment of CBA-covered workers reinforces the problems with the

---

[25] The dissent's approach would be just as objectionable had its state law analysis come out the other way, affirming the state agency's conclusion that the Airline violated the WFCA. Either way, this court would be deciding a state law issue not properly before it.

dissent's analysis. First, as the same claim exists for workers not covered by a CBA, the claim does not arise entirely from the CBA and should not be completely extinguished. *Lingle*, 486 U.S. at 409 n.8, 413 n.12. Second, in using the RLA specially to disfavor union-represented workers, the dissent would replicate the very result the Supreme Court unanimously rejected in *Livadas*. *See Livadas*, 512 U.S. at 116–17 & n.11. Like the NLRA preemption at issue in *Livadas*, RLA preemption cannot result in subjecting union-represented workers to a parallel system of substandard state law rights. *See* 45 U.S.C. § 151a(2); *Livadas*, 512 U.S. at 113–14; *see also Metro. Life*, 471 U.S. at 756; *Burnside*, 491 F.3d at 1068–69.

In sum, the only question we are asked here is *who decides* Masserant's claim — L&I or the labor arbitrator.[26] The answer cannot be the Ninth Circuit. L&I and the labor arbitrator have separate and non-overlapping competencies,

---

[26] The dissent expresses concern about plaintiffs frivolously asserting independent state law rights so as to evade the jurisdiction of the grievance and arbitration mechanism. Usually, of course, we assume state bodies are capable of applying federal law, including RLA preemption principles, of their own accord, without the need for a federal injunction.

In any event, there is no realistic possibility of evasion. If a state law right is frivolously asserted, the plaintiff's claim will be dismissed by the state body with jurisdiction over it. Furthermore, the usually short limitations period for filing an RLA minor dispute grievance will almost surely run in the interim. An employee has no incentive to forego a possibly meritorious CBA claim in favor a frivolous state action.

and each must be respected.[27]  *See Steelworkers I*, 363 U.S. at 568.


## E


Finally, although, for the reasons given, the merits are not ours to decide,[28] we observe that the dissent's reading of

---

[27] Notably, *even if* the WFCA claim required resolution of a CBA dispute, the claim would still not arise entirely from the CBA, and thus would not be fully extinguished by the RLA.  The claim would be preempted only to the extent necessary to ensure CBA construction though grievance and arbitration.  *Lingle*, 486 U.S. at 413 n.12; *see also, e.g.*, *Matson*, 840 F.3d at 1135.  Accordingly, assuming the elements of injunctive relief could be satisfied, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011), the proper approach would be to enjoin L&I only from construing any terms of the CBA.  *See Kobold*, 832 F.3d at 1034.  We note also that, in light of the Anti-Injunction Act, federal courts are likely barred from issuing injunctions where proceedings purportedly subject to RLA preemption are pending before a state court.  *See* 28 U.S.C. § 2283; *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 294 (1970).

[28] The dissent cites *Rawson* as an example of the Supreme Court reaching its own conclusions regarding the validity under state law of a state law claim.  But in *Rawson*, the Supreme Court accepted the Idaho Supreme Court's view of state law rights, and disagreed only as to the implications of the Idaho Supreme Court's holding for LMRA § 301 preemption.  *Rawson*, 495 U.S. at 370–71.

The dissent similarly cites *Burnside* as an example of a federal court's authority to construe state law in an RLA or LMRA § 301 preemption analysis.  In *Burnside*, however, the question addressed was a jurisdictional one — complete preemption — not here applicable.  In that context, we determined only that the interpretation the employer suggested was entirely implausible.  *Burnside*, 491 F.3d at 1063 (concluding that "the final choice of language in [the regulation] means what it says rather

Washington law is at the very least highly debatable. It is undisputed that Masserant's scheduled vacation was immediately available to her for several purposes, including personal medical leave, maternity leave, or bereavement leave. So the statutory right to freedom in "choice of leave" may well be implicated. Wash. Rev. Code § 49.12.270(1).

On this point, the L&I guidance regarding the WFCA, published in 2009, is informative. It explains that employees "who have access to paid leave for themselves" also have "full access . . . to this leave to care for a sick family member." State of Wash., Dep't of Labor and Indus., Emp't Standards, Frequently Asked Questions About the Family Care Act, Question 17 (December 3, 2009); *see also* Wash. Rev. Code § 49.12.265(5) ("'Sick leave or other paid time off' means time allowed . . . to an employee for illness, vacation, and personal holiday."). Masserant's claim appears consistent with this guidance; her banked vacation days were available to her for unscheduled paid leave for herself.

The same L&I guidance states that CBA provisions "concerning the use of leave, such as . . . advance scheduling

than the opposite of what it says," and observing that the explanation relied upon by the employer was a scrivener's error "incorrectly paraphras[ing] the [regulatory] language"). Once the jurisdictional question in *Burnside* was answered in the negative, we ordered the merits determination remanded to state court. *Id.* at 1074. That an analysis with jurisdictional implications should invite a threshold inquiry into the plausibility of the parties' views of state law is an unremarkable facet of federal law. *See, e.g.*, *Am. W. Airlines, Inc. v. Nat'l Mediation Bd.*, 119 F.3d 772, 775 (9th Cir. 1997) (holding, in the context of RLA representation disputes, that "a court may only 'peek at the merits' in order to determine if the [National Mediation Board] committed a constitutional violation or [an] egregious violation of the RLA" that would allow for judicial review of the Board's decision).

of vacation[,] may still be applied." But Masserant did comply with the CBA's requirement for the advance scheduling of vacation, just as the WFCA instructs. Wash. Rev. Code § 49.12.270(1) ("The employee taking leave . . . must comply with the terms . . . applicable to the leave, except for any terms relating to the choice of leave."). She then sought to use her advance-scheduled leave in accordance with her statutory right to flexibility in using earned leave for a different purpose than that assigned by her terms of employment. To require Masserant to do any more — for example, to require that she predict and preschedule her son's emergency medical needs half a year before they occurred — would seem to undermine the WFCA's freedom from restrictions on "choice of leave." *See State v. Keller*, 143 Wash. 2d 267, 277 (2001) ("Statutes must be construed so that all language is given effect with no portion rendered meaningless or superfluous."); *see also* State of Wash., Dep't of Labor and Indus., Emp't Standards, Frequently Asked Questions About the Family Care Act, Question 9 (Aug. 6, 2014) ("While the employer is permitted to establish an advanced scheduling policy generally, the policy cannot bar the employee from using vacation leave for Family Care Act purposes without violating the choice of leave provision.").

The state agency and state courts with jurisdiction over Masserant's claim and the Airline's appeal are, of course, the bodies here entrusted with interpreting and applying state law. Under our ruling, they will have both the first *and* the last word as to what the WFCA means. Our observations on the subject are meant only to show that L&I's interpretation has considerable grounding in the statute's language and purpose.

## III

Masserant's state law claim neither arises entirely from the CBA nor requires a construction of it. It is therefore not preempted under the RLA. The district court's order on summary judgment is **AFFIRMED**.

---

IKUTA, Circuit Judge, joined by TALLMAN, CALLAHAN, BEA, and M. SMITH, Circuit Judges, dissenting:

The preemptive scope of the Railway Labor Act (RLA) is clear: when resolution of a state-law cause of action requires interpretation or application of a collective bargaining agreement, it constitutes a "minor dispute" that must be resolved through the RLA's mandatory arbitral mechanism. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994). Instead of applying this rule, the majority imposes an unprecedented constraint that effectively eviscerates federal court review. The majority holds that in conducting an RLA preemption analysis, a federal court may not consider the nature and scope of the state cause of action (what the Supreme Court calls the cause of action's "legal character") but must limit itself to determining whether the plaintiff has pleaded a claim that constitutes a minor dispute. Because this constraint is directly contrary to decades of the Supreme Court's preemption decisions and impairs or extinguishes RLA preemption, I dissent.

## I

Because the majority fails to include pertinent information about the collective bargaining agreement, the

nature of Masserant's complaint before the agency, and the proceedings in federal court, a fuller description of the facts is set out below.

Laura Masserant is a flight attendant with Alaska Airlines, a federally regulated common carrier operating domestic and international flights that employs over three thousand flight attendants nationwide. Alaska Airlines's flight attendants are represented by the Association of Flight Attendants-Communication Workers of America, AFL-CIO (AFA). In accordance with the provisions of the RLA, Alaska Airlines and AFA entered into a collective bargaining agreement (CBA) detailing numerous aspects of the employment relationship. Among other provisions, the CBA covers sick leave, vacations, and leaves of absence. These provisions are critical to ensuring that Alaska Airlines can meet Federal Aviation Administration (FAA) minimum crew-staffing requirements for each of its thousands of daily flights.

Under the CBA, flight attendants accrue sick leave based on the amount they work, including the number of flights staffed and the flight mileage. Flight attendants may use sick leave in a host of situations defined by the CBA, as well as "pursuant to applicable State law and/or Company policy." Alaska Airlines, headquartered in Washington state, interprets this provision to mean that flight attendants can use sick leave to care for qualifying family members under the Washington Family Care Act (WFCA), Wash. Rev. Code § 49.12.270(1).

In addition to sick leave, flight attendants receive paid vacations. The CBA sets forth how vacations days are scheduled in a detailed process. By October 1 of each year, Alaska Airlines posts the list of available vacation times.

Flight attendants have fifteen days in which to sign up for available vacation periods, and vacation days are awarded for the following year based on these preferences and the flight attendant's seniority. Once vacation days are assigned, a flight attendant may trade these days with other flight attendants, subject to certain limitations. Flight attendants may also request early vacation pay, though the vacation days themselves remain scheduled as unpaid days off.

The CBA enumerates instances when an employee may use vacation time outside of the scheduled period. Among other things, a flight attendant may use sick leave *or* vacation time to cover certain medical leaves of absence, maternity leaves of absence, parental leaves of absence, and bereavement leaves of absence. Under Alaska Airlines's interpretation of the CBA and longstanding practice, flight attendants may not otherwise reschedule vacation. For example, Alaska Airlines contends flight attendants may not reschedule vacation time to care for themselves or a sick family member.[1]

The CBA also contains procedures for resolving disputes as to the meaning of any of the terms in the CBA concerning "rates of pay, rules or working conditions." As required by the RLA, 45 U.S.C. § 184, the CBA establishes a multi-stage process for resolving disputes concerning the interpretation or application of the CBA, culminating in mandatory arbitration before a neutral board of adjustment. Decisions by this board are "final and binding upon the parties."

---

[1] If flight attendants take absences that do not meet the criteria specified in the CBA, they incur attendance points, which may become the basis for disciplinary action.

In October 2010, Masserant signed up for her preferred 2011 vacation schedule. At the beginning of 2011, Masserant was awarded four vacation days in January, and seven in each of February, April, November, and December. As allowed by the CBA, Masserant took her four paid vacation days in January, and then requested early vacation pay for the days scheduled in February, April, and November. Masserant was therefore left with only seven paid vacation days—all scheduled for December.

On May 20, 2011, Masserant needed time off to care for her son, and requested sick leave to cover a two-day trip from May 21–22. Alaska Airlines informed her that she did not have sick leave available for the entire two-day trip, and she was not entitled to reschedule her paid vacation days in December to cover the absence. As a result, she would receive attendance points for an emergency absence.

Ignoring the CBA's grievance procedures for challenging Alaska Airlines's implementation of the contract's sick leave and vacation policy, Masserant, supported by her Union, instead filed a complaint with the Washington Department of Labor & Industries (L&I) on June 16, 2011. In her complaint to L&I, Masserant challenged Alaska Airlines's application of its sick leave policy, arguing that it had both failed to credit her for sick leave accrued in May and failed to let her use accrued sick leave to cover a portion of her absence. Masserant also challenged Alaska Airlines's application of the CBA's vacation policy, stating: "I asked my company to

use my remaining week of vacation for this occurrence. This is earned time that I was denied to use."[2]

In response to L&I's investigation of Masserant's complaint, Alaska Airlines explained that reliable attendance in conformance with FAA safety regulations requiring minimum crew staffing for every flight was vital to "deliver on its mission," and gave details regarding its complex bidding process for vacations. According to Alaska Airlines, under the CBA, "[f]light attendants are not permitted to use vacation on an unscheduled basis when they get sick," and therefore "it is consistent with the WFCA that the flight attendant not be able to use vacation when a family member gets sick."

L&I first acknowledged its "position" that "any policy (including advanced vacation scheduling and medical verification) are allowable as long as they don't relate to the choice of leave." However, L&I concluded that Alaska Airlines's interpretation of the CBA was undercut by the fact that "[t]here are occasions when vacation time is 'available' for flight attendants that are not affected by the seniority based bidding process." Because flight attendants can use "accrued sick leave and/or vacation leave" on an unscheduled basis for medical absences, maternity leave, and bereavement leave, L&I was "troubled" that paid vacation was not offered for family care. Therefore, L&I issued a Notice of Infraction, dated May 31, 2012, stating that "Ms. Masserant was entitled to seven (7) days of vacation," and under WFCA, Alaska

---

[2] At the time of the complaint, Masserant was president of the local AFA chapter, and was well aware that AFA and Alaska Airlines were engaged in discussions regarding whether the CBA allowed a flight attendant to use vacation time to care for a sick child.

Airlines must allow her to use this vacation leave to care for her sick child.  It ordered Alaska Airlines to pay a $200 penalty.[3]

In March 2012, Alaska Airlines filed an amended complaint in district court against L&I.[4]  The complaint sought preliminary and permanent injunctive relief enjoining L&I from continuing to investigate or enforce Masserant's complaint.  In support of this request for relief, the complaint alleged that the RLA preempted such enforcement efforts because the mechanisms provided in the CBA were Masserant's exclusive means of resolving this dispute.  The district court granted AFA's motion to intervene on behalf of Alaska Airlines's employees in order to defend their members' rights to enforce WFCA using L&I's procedures.

The parties then filed cross-motions for summary judgment on the question whether the RLA preempted Masserant's state-law cause of action and required her to resolve this dispute through the CBA's dispute resolution

[3] Alaska Airlines filed an administrative appeal of the Notice of Infraction, and AFA petitioned to intervene, but the appeal was subsequently dismissed without prejudice pending the resolution of Alaska Airline's action in federal court.

[4] Alaska Airlines first filed a complaint for injunctive and declaratory relief to enjoin L&I from processing flight attendants' WFCA complaints and to declare such complaints preempted in all instances under the RLA. (Formally, the first complaint, as well as the amended complaint, named Judy Schurke, in her official capacity as Director of L&I, and Elizabeth Smith, in her official capacity as Employment Standards Program Manager of L&I, as defendants.)  The district court dismissed the complaint on the ground that Alaska Airlines's claims were not fit for judicial decision, because Ninth Circuit case law requires analysis of RLA preemption on a case-by-case basis.

procedures.  In district court, L&I no longer suggested that Masserant was entitled to use vacation time to care for a sick child in this case because the CBA allowed vacation time to be used for medical leave and other purposes.  Instead, L&I and AFA argued that the question whether the CBA allowed Masserant to use vacation time for her own illness or that of her child was not material because WFCA gave Masserant an independent right to use her vacation days at any time, whether scheduled or not.  The district court ruled in favor of AFA and L&I, concluding that WFCA "may" grant Masserant an independent right to use her December vacation time to care for her sick child in May, and therefore the complaint was not preempted by the RLA.

On appeal, Alaska Airlines argues that Masserant's claim raises the sort of dispute that has to be determined through the CBA's dispute resolution process.  In response, L&I and AFA argue that as a matter of law, WFCA gives employees a non-negotiable right, independent of the CBA, to use vacation days to care for sick family members "irrespective of any limitations that an employer would attempt to put on that leave," including "any advance scheduling requirements for the flight attendant's vacation."  As explained below, L&I and AFA's litigating position is not supported by the plain language of the statute and regulations, and therefore resolving Masserant's claim requires the interpretation and application of the CBA.

## II

The simple question before us is whether the RLA preempts Masserant's cause of action because it is a minor dispute that must be channeled through the RLA's mandatory arbitral mechanism. *See Hawaiian Airlines*, 512 U.S. at 253.

The majority fails to understand or apply the Supreme Court's direction for determining whether a state-law cause of action is preempted by the RLA, and so reaches the wrong conclusion.

A

Congress enacted the RLA in 1926 "to promote stability in labor-management relations" between railroad companies and their employees. *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562–63, 562 n.9 (1987) (quoting *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978)).[5] To accomplish these goals, "the RLA establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of disputes," major and minor. *Hawaiian Airlines*, 512 U.S. at 252 (quoting 45 U.S.C. § 151a). Under the RLA, all disputes arising out of the interpretation or application of an air carrier's collective bargaining agreement are minor disputes that must proceed through "RLA mechanisms, including the carrier's internal dispute-resolution processes and an adjustment board established by the employer and the unions." *Id.* at 253; *see also* 45 U.S.C. § 153(i).

The RLA's mandatory arbitral mechanism is the "heart of the Railway Labor Act," *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–78 (1969), and the key mechanism for "minimizing interruptions in the Nation's transportation services," *Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 687 (1963). Accordingly, the Supreme Court inferred that Congress

---

[5] The RLA was amended in 1936 to cover the air transportation industry. 45 U.S.C. §§ 181–188.

intended the RLA's mandatory arbitral mechanism to be the exclusive method for resolving minor disputes, and it therefore has preemptive force. *See Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 322 (1972). A state-law cause of action is preempted if it conflicts with the RLA's mandatory arbitral mechanism for resolving minor disputes. *See Hawaiian Airlines*, 512 U.S. at 252–53.

The Supreme Court provides for a straightforward preemption analysis in the RLA context (as well as under § 301 of the Labor Management Relations Act (LMRA)).[6] A state-law cause of action that is "founded directly on rights created by collective-bargaining agreements" or that involves claims "substantially dependent on analysis of a collective-bargaining agreement," is governed by federal law. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) (quoting *Int'l Bhd. of Elec. Workers, AFL-CIO v. Hechler*, 481 U.S. 851, 859 n.3 (1987)). When resolution of the state-law claim involves "interpretation or application" of a collective bargaining agreement, the claim is not independent of the agreement, but constitutes a minor dispute that must be resolved through the RLA's mandatory arbitral mechanism. 45 U.S.C. § 153(i); *Hawaiian Airlines*, 512 U.S. at 252–53. Similarly, when a state-law remedy "turn[s] on the interpretation of a collective-bargaining agreement for its application," the remedy is preempted by the RLA. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 n.7 (1988); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210–11, 217–18 (1985). Finally, even "if a law applied to all state workers but required, at least in certain instances, collective-bargaining agreement interpretation, the

---

[6] The Supreme Court applies the same preemption standard for the RLA and § 301 of the LMRA. *Hawaiian Airlines*, 512 U.S. at 263.

application of the law in those instances would be preempted." *Lingle*, 486 U.S. at 407 n.7.

By contrast, when a state law establishes substantive rights that are independent of a collective bargaining agreement, the enforcement of such rights under state law may not be preempted. *See, e.g.*, *Colo. Anti-Discrimination Comm'n v. Cont'l Air Lines, Inc.*, 372 U.S. 714, 724 (1963); *Terminal R.R. Ass'n of St. Louis v. Bhd. of R.R. Trainmen*, 318 U.S. 1, 5–7 (1943). Further, "the Supreme Court has distinguished between claims that require interpretation or construction of a labor agreement and those that require a court simply to 'look at' the agreement." *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108 (9th Cir. 2000) (citing *Livadas v. Bradshaw*, 512 U.S. 107, 123–26 (1994)). "[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livada*s, 512 U.S. at 124.[7]

## B

WFCA gives employees a state-law right which, by its terms, is based on rights provided by a collective bargaining

---

[7] Although we have distinguished between merely referencing a collective bargaining agreement and interpreting its terms, we do not otherwise define the term "interpret" narrowly. *Cf.* Maj. Op. at 19. Under the RLA, minor disputes are the disputes "growing out of grievances or out of the interpretation *or application* of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153(i) (emphasis added). Any state-law cause of action that requires a court to determine how a collective bargaining agreement applies to the facts of a case is a minor dispute that is preempted. *See Hawaiian Airlines*, 512 U.S. at 253.

agreement.**⁸** Wash. Rev. Code § 49.12.270. "If, under the terms of a collective bargaining agreement or employer policy applicable to an employee, the employee is entitled to sick leave or other paid time off," then the employee may use the employee's "choice of sick leave or other paid time off" to care for a qualifying relative. *Id.* § 49.12.270(1).**⁹** An employee who takes leave "under the circumstances

---

**⁸** Washington Revised Code section 49.12.270 provides, in full:

(1) If, under the terms of a collective bargaining agreement or employer policy applicable to an employee, the employee is entitled to sick leave or other paid time off, then an employer shall allow an employee to use any or all of the employee's choice of sick leave or other paid time off to care for: (a) A child of the employee with a health condition that requires treatment or supervision; or (b) a spouse, parent, parent-in-law, or grandparent of the employee who has a serious health condition or an emergency condition. An employee may not take advance leave until it has been earned. The employee taking leave under the circumstances described in this section must comply with the terms of the collective bargaining agreement or employer policy applicable to the leave, except for any terms relating to the choice of leave.

(2) Use of leave other than sick leave or other paid time off to care for a child, spouse, parent, parent-in-law, or grandparent under the circumstances described in this section shall be governed by the terms of the appropriate collective bargaining agreement or employer policy, as applicable.

**⁹** "Sick leave or other paid time off" is defined, in part, as "time allowed under the terms of an appropriate state law, collective bargaining agreement, or employer policy, as applicable, to an employee for illness, vacation, and personal holiday." Wash. Rev. Code § 49.12.265(5).

described in this section must comply with the terms of the collective bargaining agreement or employer policy applicable to the leave, *except for any terms relating to the choice of leave*." *Id.* (emphasis added). In other words, if an employee is entitled to sick leave or other paid time off under the terms of a collective bargaining agreement, WFCA gives that employee the right to choose either sick leave or other paid time off for qualifying family care; the employee must otherwise comply with all other terms of the collective bargaining agreement.

L&I's published regulations directly track the language of the statute, *see* Wash. Admin. Code § 296-130-030, and a number of guidance documents provide a consistent interpretation of the statutes and regulations. One such document, published in December 2009, explains that the state-law right provided to employees under WFCA gives employees who "have access to paid leave for themselves" the right to "full access to any and all of this leave to care for a sick family member."[10] State of Wash., Dep't of Labor &

---

[10] The pertinent paragraph in the guidance document states:

> What is meant by the provision that says the employer must allow an employee to use any and all of the employee's choice of sick leave or other paid time off to care for a sick family member?

> Employees must have access to any available sick leave or other paid time off to care for a sick family member. If employees have access to paid leave for themselves, then they must have full access to any and all of this leave to care for a sick family member. This law directs the employer to allow employees the choice of available leave to care for a sick family member. Employers must now allow use of sick leave and other

Indus., Emp't Standards, Frequently Asked Questions About the Family Care Act, Question 17 (Dec. 3, 2009). According to L&I, state law imposes on employers an independent obligation of allowing "use of sick leave and other paid time off to care for a sick family member even if a pre-existing collective bargaining agreement or employer policy prohibited such use." *Id.* This right is limited, however, as the guidance explains: "provisions of collective bargaining agreements or employer policies regarding the accumulation of leave and other provisions concerning the use of leave, such as medical certification and *advance scheduling of vacation may still be applied*." *Id.* (emphasis added). In other words, advanced scheduling of vacation time is a term "of the collective bargaining agreement or employer policy applicable to the leave" that an employee "must comply with" in order to take leave under WFCA. *See* Wash. Rev. Code § 49.12.270(1). L&I originally adopted this interpretation in this case, acknowledging that "any policy (including advanced vacation scheduling and medical verification) are allowable as long as they don't relate to the choice of leave."

In the course of litigating Masserant's claim, L&I proffered a new interpretation of the statute, arguing that

---

paid time off to care for a sick family member even if a pre-existing collective bargaining agreement or employer policy prohibited such use. However, provisions of collective bargaining agreements or employer policies regarding the accumulation of leave and other provisions concerning the use of leave, such as medical certification and advance scheduling of vacation may still be applied.

State of Wash., Dep't of Labor & Indus., Emp't Standards, Frequently Asked Questions About the Family Care Act, Question 17 (Dec. 3, 2009).

WFCA "confers on employees the non-negotiable right, independent of collective bargaining agreements, to choose to use any earned leave provided by a collective bargaining agreement to care for sick family members, irrespective of any limitations that an employer would attempt to put on that leave—including any limitation that Alaska might put on a flight attendant's use of leave for the flight attendant's own illness or any advance scheduling requirements for the flight attendant's vacation."[11]

L&I's interpretation, proffered for the first time as a litigation position, must be rejected because it is contrary to the language of the statute, the regulations, and L&I's own 2009 guidance document, all of which require employees to comply with the terms of the collective bargaining agreement "*except for* any terms relating to choice of leave." Wash. Rev. Code § 49.12.270(1) (emphasis added); *see* Wash. Admin. Code § 296-130-030. Contrary to L&I's litigation

---

[11] In August 2014 (two years after issuing the Notice of Infraction, and one year after the district court's decision in this case), L&I issued a modified guidance document, which now states: "[I]f an employer policy requires advanced scheduling for vacation leave, the policy would be inapplicable to an employee who chooses to use vacation leave to take care of a sick family member. While the employer is permitted to establish an advanced scheduling policy generally, the policy cannot bar the employee from using vacation leave for Family Care Act purposes without violating the choice of leave provision." State of Wash., Dep't of Labor & Indus., Emp't Standards, Frequently Asked Questions About the Family Care Act, Question 9 (Aug. 6, 2014), http://www.lni.wa.gov/WorkplaceRights/files/policies/esc10.pdf. This document does not provide any reasoning or statutory interpretation; nor does L&I explain the reasons for its sharp change from earlier views. Furthermore, as L&I recognizes in its own brief, the FAQs "do 'not replace the applicable RCW and WAC standards[,]' because general policies do not trump the plain language of the statute."

position, nothing in WFCA gives employees the right to use vacation leave to care for a qualifying relative when that leave is unavailable under the collective bargaining agreement. In the RLA and § 301 context, the Supreme Court has declined to defer to an agency interpretation that "simply slips any tether to [state] law," where an agency's "late-blooming rationales" create an "awkwardly inexact" overlap between the agency's interpretation and "what the state legislature has enacted into law." *Livadas*, 512 U.S. at 126, 128. Similarly, in *Burnside v. Kiewit Pacific Corp.*, we rejected an agency's published interpretation of a wage order on the ground that "it is the plain language of an actual, enacted regulation which must govern, not language that appears in the underlying rationale." 491 F.3d 1053, 1064 (9th Cir. 2007).

The Court has adopted a similar approach in considering federal agency interpretations of federal statutes, and does not defer to agency interpretations that are contrary to the language of the statute, are "nothing more than 'a convenient litigating position,'" or that constitute "a '*post hoc* rationalizatio[n] . . . seeking to defend past agency action against attack.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (first alteration in original) (first quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988); then quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997))). Washington courts take a similar approach. *See Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wash. 2d 621, 627–28 (1994) (Washington courts "will not defer to an agency determination which conflicts with the statute"); *Cerrillo v. Esparza*, 158 Wash. 2d 194, 205–06 (2006) (holding that absent ambiguity, Washington courts do not defer to agency interpretations; courts will "glean the legislative intent from the words of the statute itself,

regardless of contrary interpretation by an administrative agency" (quoting *Agrilink Foods, Inc. v. State, Dep't of Revenue*, 153 Wash. 2d 392, 396 (2005))).

In short, to plead a WFCA claim, employees must show they are entitled to sick leave or other paid time off under the terms of their collective bargaining agreement; only if that threshold qualification is met are employers obliged to let employees choose to use the time off for qualifying family care.

C

Applying these principles here, Masserant must show that she is "entitled to" paid time off "under the terms of [the] collective bargaining agreement," and that she "compl[ied] with the terms of the collective bargaining agreement . . . applicable to the leave," Wash. Rev. Code § 49.12.270(1), including any requirements applicable to rescheduling vacation time. Masserant's WFCA claim therefore turns on whether she was entitled to reschedule her December vacation time under the terms of the CBA.[12] If answering this threshold question requires interpretation or application of the CBA, it must be resolved through the RLA's mandatory arbitral mechanism before she can exercise the state-law right to choose.

---

[12] The majority asserts that whether Masserant is "entitled" to vacation time is a state-law dispute because the term is "contained within the WFCA," and therefore outside the scope of minor disputes. Maj. Op. at 31. This assertion is meritless. WFCA states that an employee is "entitled to" paid time off only when the "terms of a collective bargaining agreement" so provide. Wash. Rev. Code § 49.12.270(1). Unless a mere look at the CBA establishes Masserant's entitlement, it is necessary to interpret the CBA's terms and apply them to Masserant's situation.

The CBA does not expressly address an employee's entitlement to reschedule vacation time.  Nor did the parties argue to the district court or in their briefs on appeal that Alaska Airlines's practice—not to allow such rescheduling of vacation time to care for a sick relative—is an implied term of the CBA based on "the parties' 'practice, usage and custom.'"  *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n (Conrail)*, 491 U.S. 299, 311 (1989) (quoting *Transp. Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 161 (1966)).

At oral argument, L&I and AFA asserted for the first time that they are willing to concede that the CBA does not allow flight attendants to reschedule vacation time to take care of family members.[13]  Given their concession, they argue, it is not necessary to consult the CBA to determine whether Masserant was entitled to reschedule her December vacation time.

This argument must be rejected.  As a threshold matter, neither AFA nor L&I have authority to make such a concession on Masserant's behalf.  The question at issue is whether Masserant, not AFA or L&I, must pursue her claim using the RLA's mandatory arbitral mechanism.  In her complaint to L&I, Masserant claimed that Alaska Airlines refused her request to use December vacation time to care for her sick child in May.  She did not concede that she had no such right under the CBA.  Neither AFA nor L&I represent

---

[13] This represents a change in L&I's position, which argued to the district court that the CBA does not address the question whether the CBA allows flight attendants to reschedule vacation time to take care of family members.  AFA argued to the district court that the CBA does not allow such rescheduling, but in its brief on appeal backed off from this position, stating that its argument was solely for purposes of the summary judgment motion and the issue is irrelevant on appeal.

Masserant in this appeal, and neither claims to have authority to waive Masserant's access to the CBA's dispute resolution mechanism.  Moreover, although Alaska Airlines states it has long had the practice of not allowing flight attendants to reschedule vacation time to care for sick family members, unilateral conduct by an employer is not automatically incorporated as an implied term of the CBA.  *Id.* at 311. Rather, as with other disputes requiring an interpretation of the CBA, the question whether a particular entitlement or duty constitutes "the common law of a particular industry or of a particular plant" such that it has become part of the CBA must be determined through the arbitral mechanism.  *Id.* at 311–12 (quoting *Transp. Union*, 385 U.S. at 161).

In short, the question whether Masserant is entitled to reschedule her vacation time under the terms of the CBA cannot be resolved by merely looking to the agreement, but requires interpretation and application of the CBA. Therefore, it is a quintessential minor dispute that must be channeled through the RLA's mandatory arbitral mechanism. *See Hawaiian Airlines*, 512 U.S. at 252–53.

D

This conclusion is in accord with the purposes of the RLA.  In considering common carriers with nationwide operations, Congress recognized the importance of avoiding "any interruption to commerce or to the operation of any carrier engaged therein," by ensuring that disputes would be settled consistently and promptly through the RLA's mandatory arbitral mechanism.  45 U.S.C. § 151a.  Here, Alaska Airlines argues that flight attendant absences pose unique concerns in the airline industry.  Under FAA regulations, a plane cannot take off without the requisite

number of flight attendants on board; thus, ensuring employee attendance is critical to the basic operations of an air carrier. While Alaska Airlines retains and pays for flight attendants to be on "reserve" to cover for unexpected absences, those reserves are not unlimited. Such backup measures are not intended to ensure consistent day-to-day operations. For that, Alaska Airlines relies on its negotiations with AFA for detailed scheduling of leave, attendance, and absence, as embodied in the CBA. A cornerstone of these negotiations is the mandatory arbitral mechanism, designed for "the prompt and orderly settlement" of disputes concerning the CBA's negotiated leave terms. *Id.* If state courts could apply the potentially conflicting state law of each of the fifty states to interpret the CBA's terms and conditions, the congressional goal of consistent, reliable operation would be threatened, and the application of state law "might lead to inconsistent results since there could be as many state-law principles as there are States." *Lingle*, 486 U.S. at 405–06.

## III

Instead of applying this straightforward analysis, the majority circumvents Supreme Court precedent and offers a series of disconnected arguments for why we must deem Masserant's claim to be a question of state law that is not a minor dispute. First, the majority notes that RLA preemption is a type of "forum preemption," which considers whether a particular cause of action must be heard in a state or federal forum. Maj. Op. at 24–25. Based on this unexceptionable observation, the majority leaps to the unsupported and untenable argument that unlike "conflict preemption," which allows consideration of state law, RLA preemption precludes any consideration of the state law governing a cause of

action.  Maj. Op. at 21–24.  Any analysis of the nature and scope of the state-law cause of action, the majority asserts, is the same as reaching the merits of the state-law claim.  Maj. Op. at 32–33, 36–37.  This approach, the majority urges, is contrary to forum preemption analysis, which allows a court to decide only who the decisionmaker will be.  Maj. Op. at 35–36.  According to the majority, a federal court's "only job is to decide whether, *as pleaded*," a claim is independent of the CBA.  Maj. Op. at 24 (emphasis added).  As explained below, each of these conclusions is not only baseless and illogical, but contrary to Supreme Court and our own precedent.

A

The majority's main argument—that RLA preemption precludes consideration of state law, Maj. Op. at 30–32—has no support in any Supreme Court or Ninth Circuit precedent.

As the Supreme Court has framed it, to determine whether "a state cause of action may go forward" or is instead preempted by § 301, a court must consider the "legal character" of a state-law claim.  *Livadas*, 512 U.S. at 123–24.[14]  In the RLA and § 301 context, federal courts must understand the claim's legal character to determine whether the state-law cause of action is "founded directly on rights created by collective-bargaining agreements" or on claims

---

[14] The majority concedes that courts must understand the legal character of a state cause of action before it can determine whether the cause of action must be channeled through the RLA's mandatory arbitral mechanism.  Maj. Op. at 24, 29.  But the majority does not attempt to determine the legal character of Masserant's WFCA claim or explain how this determination should be accomplished.

"substantially dependent on analysis of a collective-bargaining agreement." *Caterpillar Inc.*, 482 U.S. at 394 (quoting *Hechler*, 481 U.S. at 859 n.3). If it is, dispute resolution is governed by the RLA or § 301. *Id.* As the Supreme Court applies this test, the analysis involves interpreting state law.

In *United Steelworkers of America v. Rawson*, for instance, the survivors of miners who were killed in an underground fire brought a state wrongful death action against the union, claiming it had negligently performed an inspection of the mine. 495 U.S. 362, 364 (1990). Although the union had undertaken the inspection pursuant to a collective bargaining agreement, the Idaho Supreme Court held that the union had a state-law duty to perform a reasonable inspection which "arose from the fact of the inspection itself rather than the fact that the provision for the Union's participation in mine inspection was contained in the labor contract." *Id.* at 370–71. Therefore, the Idaho Supreme Court "rejected the suggestion that there was any need to look to the collective-bargaining agreement to discern whether it placed any implied duty on the Union." *Id.* at 370. Reading this opinion in light of other state law, however, the Supreme Court rejected the plaintiffs' argument that their tort claim was independent of the collective bargaining agreement. *Id.* at 371. Based on its understanding of Idaho law, including the state supreme court decision, the Supreme Court concluded that the union's duty of care arose out of its contractual obligations. *Id.* Therefore, the plaintiffs could not avoid preemption of their state cause of action "by

characterizing the Union's negligent performance" as merely a state-law tort. *Id.* at 371–72.**[15]**

In reaching this conclusion, the Court rejected Justice Kennedy's dissent, which argued that a state cause of action is saved from preemption by § 301 so long as there is an interpretation of state law that would allow it to operate independently of a collective bargaining agreement. *See id.* at 379  (Kennedy, J., dissenting) (arguing that because there is a "possibility . . . that the respondents may prove" their case "without relying on the collective bargaining agreement," the court should allow the respondents to "press their state claims").   Further, the Court rejected Justice Kennedy's suggestion that "[i]f the Idaho Supreme Court, after a trial on the merits, were to uphold a verdict resting on the Union's obligations under the collective-bargaining agreement, we could reverse its decision."  *Id.* at 380.   In

---

**[15]** The majority attempts to distinguish *Rawson* on the ground that it "disagreed only as to the implications of the Idaho Supreme Court's holding for LMRA § 301 preemption."  Maj. Op. at 36 n.28.  This is simply incorrect.  *Rawson* carefully analyzed the Idaho Supreme Court's opinion on state tort law (the duty of care) to understand the nature and scope of state law.  *Rawson*, 495 U.S. at 371 ("Nor do we understand the Supreme Court of Idaho to have held that any casual visitor in the mine would be liable for violating some duty to the miners if the visitor failed to report obvious defects to the appropriate authorities.").   Having conducted its own analysis of state tort law, *Rawson* rejected the plaintiffs' claim that there was a colorable interpretation of state law which would not require interpretation or application of a collective bargaining agreement.  Rather, it held that "[p]re-emption by federal law cannot be avoided by characterizing the Union's negligent performance of what it does on behalf of the members of the bargaining unit pursuant to the terms of the collective-bargaining contract as a state-law tort."  *Id.* at 371–72.  Therefore, the Court concluded that "this suit, if it is to go forward at all, must proceed as a case controlled by federal, rather than state, law."  *Id.* at 372.

other words, *Rawson* forecloses the majority's view that a federal court must defer to any proposed interpretation of state law and allow a state-law claim to proceed on that theory. Maj. Op. at 24. Rather, federal courts must analyze state law to determine the legal character of the state-law claim.

The Court takes a similar approach in determining the preemptive force of ERISA, which "mirror[s] the pre-emptive force of LMRA § 301." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). Like the RLA and § 301, ERISA channels certain disputes into a congressionally mandated mechanism and preempts state causes of action that interfere with this mechanism.[16] *Id.* at 208–09. The ERISA preemption question asks whether a state-law claim falls "within the scope" of ERISA's civil enforcement remedy and therefore "conflicts with the clear congressional intent to make the ERISA remedy exclusive." *Id.* at 209. To determine whether a state-law claim falls within the scope of ERISA's exclusive civil enforcement mechanism, courts "must examine respondents' complaints, *the statute on which their claims are based . . .*, and the various plan documents." *Id.* at 211 (emphasis added). The same is true in the RLA and § 301 context.

We have likewise construed the nature and scope of state law to rule on preemption in our prior § 301 opinions. *See*

---

[16] Thus the majority's statement that "*Davila* has nothing to do with the subject of the RLA or LMRA § 301 preemption analysis," Maj Op. at 22 n.15, is unsupportable. ERISA protects a congressionally-mandated, "comprehensive remedial scheme." *Davila*, 542 U.S. at 217. Like the RLA and § 301, ERISA seeks to enforce a federal pathway for resolving disputes, and preempts state causes of action that conflict with that pathway. Therefore, *Davila* is an apt comparison.

*Burnside*, 491 F.3d at 1064. In *Burnside*, an employee covered by a collective bargaining agreement brought various state-law claims against his employer based on the employer's failure to pay wages for time traveled between company-designated meeting points and actual job sites. *Id.* at 1056, 1058. The state regulation giving employees the right to be compensated for compulsory travel time stated that it applied "to any employees covered by a valid collective bargaining agreement *unless the collective bargaining agreement expressly provides otherwise*" (an "opt-out" regulation). *Id.* at 1062 (quoting Cal. Code Regs. tit. 8, § 11160(5)(D)). But the agency with authority to construe this law held it "*does not apply* to any employee covered by a valid collective bargaining agreement unless the collective bargaining agreement expressly provides otherwise" (an "opt-in" regulation). *Id*. at 1063. *Burnside* viewed the interpretation of this rule to be critical for determining whether the employee could bring a state cause of action. If the agency's interpretation was correct, "the state-law rights can be more readily viewed as existing only if the CBA says so and as therefore dependent on the CBAs," *id.* at 1064 n.11, which would likely have led to the conclusion it was preempted. Instead of accepting the agency's interpretation, *Burnside* construed the state law, concluded that the agency's interpretation of the regulation was incorrect, and held that "[i]n any event, it is the plain language of an actual, enacted regulation which must govern, not language that appears in the underlying rationale." *Id.* at 1064[17]; *see also Valles v. Ivy*

---

[17] The majority attempts to distinguish *Burnside* because it considered the preemptive force of § 301 in a jurisdictional context. Maj. Op. at 36 n.28. As explained below, *infra* Section III.B., this distinction is meritless. Indeed, given the majority's reliance on the two-part test adopted in *Burnside*, Maj. Op. at 18–19 (applying *Burnside* and

*Hill Corp.*, 410 F.3d 1071, 1077 (9th Cir. 2005) (recognizing that we "begin" § 301 preemption analysis "with an examination of California statutes, regulations, and case law").

Accordingly, contrary to the majority, it is well established that determining the legal character of a state cause of action by interpreting the state law at issue is an essential step in deciding the RLA preemption question.

B

In the absence of any Supreme Court or Ninth Circuit support for its theory that a court may not consider state law in determining whether a state cause of action constitutes a minor dispute, the majority resorts to other arguments: it tries and fails to identify a meaningful distinction between RLA preemption and conflict preemption; cites inapposite out-of-circuit cases; and analogizes to the inapplicable doctrines of primary jurisdiction and contract analysis in the arbitration context.  Each of these efforts fails.

First, the majority argues that while courts consider state law in determining "typical conflict preemption," courts may not do so in considering "RLA and LMRA § 301 preemption" because they are instead "grounded in the need to protect the proper *forum* for resolving certain kinds of disputes."  Maj.

---

subsequent cases that rely on *Burnside* for its preemption analysis), it is baffling that the majority claims *Burnside* is "not here applicable."  Maj. Op. at 36 n.28.

Op. at 21. This argument is meritless.[18]  In purporting to
distinguish between conflict preemption and forum
preemption, the majority misses the basic point that all
preemption flows from the Supremacy Clause, which dictates
that federal law "shall be the supreme Law of the Land."
U.S. Const. art. VI, § 1, cl. 2.  To be sure, the scope of
preemption is a matter of congressional intent, *see Lueck*,
471 U.S. at 208, and therefore the preemptive force of federal
legislation varies depending on that intent.  We have used
shorthand to refer to our understanding of the preemptive
force of certain statutes, referring to *Garmon* preemption[19]
and *Machinists* preemption[20] in the labor context, as well as

---

[18] Indeed, the Court has never suggested that anything other than
ordinary conflict preemption principles apply, emphasizing that the
question under § 301 (and therefore under the RLA) is whether a state-law
claim conflicts with federal labor law. *See Lueck*, 471 U.S. at 209 (under
§ 301, federal courts must determine whether a state-law claim "conflicts
with federal law or would frustrate the federal scheme" (citation omitted));
*Livadas*, 512 U.S. at 120 ("In labor pre-emption cases, as in others under
the Supremacy Clause," courts must decide if a state-law claim "conflicts
with or otherwise 'stands as an obstacle to the accomplishment and
execution of the full purposes and objectives' of the federal law." (quoting
*Brown v. Hotel Emps.*, 468 U.S. 491, 501 (1984))).  The majority asserts
that *Livadas* illuminates a distinction between ordinary conflict
preemption and § 301 preemption.  Maj. Op. at 25–28.  *Livadas* does not
support the majority's point.  Rather, it merely recognizes that the NLRA
and § 301 have different preemptive effects.  *See Livadas*, 512 U.S. at
116–17, 121–23.  We, of course, agree that the two statutes and their
preemptive effects are distinct.  *Livadas* does not hold, however, that a
proper interpretation of state law is irrelevant to the § 301 preemption
question.

[19] *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959).

[20] *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis.
Emp't Relations Comm'n*, 427 U.S. 132 (1976).

forum preemption, field preemption, conflict preemption, express preemption, and the like. But such labels do not change the basic principle of federal preemption, namely: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018).

For the same reason, the majority errs in attempting to distinguish cases that considered the preemptive force of federal statutes in a jurisdictional context. The same basic preemption principles apply in the complete preemption context, even though the question is jurisdictional. While we are generally bound by the well-pleaded complaint rule, "which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint," *Balcorta*, 208 F.3d at 1106, the preemptive force of some federal statutes, such as § 301 of the LMRA, is "so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule,'" *Caterpillar Inc.*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 64 (1987)). Federal question jurisdiction is supported only when a claim falls within the preemptive scope of federal law. *See Balcorta*, 208 F.3d at 1106. Therefore, courts ask the same question in deciding whether a claim is completely preempted (and thus supports federal question jurisdiction) and in deciding whether a state-law claim is preempted by § 301—whether the state-law claim depends "on rights created by collective-bargaining agreements." *Caterpillar Inc.*, 482 U.S. at 394. Thus, the majority's attempts to distinguish *Davila* and *Burnside*, Maj.

Op. at 22 n.15, 36 n.28, because they considered the preemptive force of federal statutes in a jurisdictional context, is wholly without support. *See, e.g.*, *id.* at 394–95 (applying the test for § 301 preemption to a complete preemption question).

These basic principles of preemption require federal courts to determine when congressional intent supersedes state requirements. Regardless whether Congress intended to supersede state law regulating behavior (typical conflict preemption) or to supersede state law creating causes of action (typical forum preemption), it is necessary to evaluate the state law in order to determine if it conflicts with the federal law. The majority errs in its apparent belief that reading state statutes to resolve the forum preemption question is equivalent to reading state statutes to decide the merits of a dispute. Maj. Op. 21–22. Courts are perfectly capable of, and indeed are required to evaluate a state-law cause of action to determine whether it creates a minor dispute without evaluating and deciding the dispute itself. Reading state law is a part of that analysis. *See supra* Section II.A.

Second, in the absence of any Ninth Circuit precedent, the majority points to out-of-circuit cases to support its argument that forum preemption precludes consideration of state law, but they lend no support. Rather, the cases cited by the majority merely articulate the scope of RLA preemption. *See Davies v. Am. Airlines, Inc.*, 971 F.2d 463, 465 n.1 (10th Cir. 1992) (holding that "the RLA vests exclusive and mandatory jurisdiction over certain claims in an arbitral forum," and noting that RLA preemption is different than "the doctrine of field preemption," which addresses whether Congress has "precluded states from regulating a particular area of

conduct"); *see also Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 273–74 (2d Cir. 2005) (holding that "state-law claims that are disguised minor disputes" are "preempted by the RLA," but that the RLA does not support federal question jurisdiction); *Ry. Labor Execs. Ass'n v. Pittsburgh & Lake Erie R. Co.*, 858 F.2d 936, 942–43 (3d Cir. 1988) (holding that the RLA does not support federal question jurisdiction); *Miller v. Norfolk & W. Ry. Co.*, 834 F.2d 556, 560–61 (6th Cir. 1987) (distinguishing between complete preemption and "choice of forum" preemption). However, neither the Tenth Circuit in *Davies* nor any other circuit has held, or even hinted, that a proper construction of state law is irrelevant to RLA or § 301 preemption.

Finally, the majority analogizes to the prudential doctrine of primary jurisdiction and to the contract principles used to determine when issues have been submitted to an arbitrator. Maj. Op. at 21–23. These analogies fail. Primary jurisdiction is "a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002). Cases applying primary jurisdiction doctrine do not grapple with the question whether a proper construction of state law is necessary for preemption purposes. The majority also analogizes to arbitrability disputes under the Federal Arbitration Act. *See* Maj. Op. at 21 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). *First Options* uses contract principles to determine whether the parties agreed to submit the issue of arbitrability to the arbitrator. 514 U.S. at 943. It does not provide any support to the majority's claim that a federal court cannot consider the state cause of action to determine

whether it constitutes a minor dispute.[21]    Even if the majority's analogies were apt, neither doctrine establishes that a court is precluded from construing the state law here.

## C

The Supreme Court and Ninth Circuit precedent described above also dispose of the majority's argument that construing WFCA to analyze preemption is the same as reaching the merits of Masserant's WFCA claim.  It is evident that the merits of a dispute pose analytically distinct questions from the question of who has the power to decide a particular legal question.  *Cf. First Options*, 514 U.S. at 942.    As demonstrated in *Rawson* and *Burnside*, analyzing the state law at issue is the only way to decide whether a state cause of action brings a claim that is "independent of any right established by contract, or, instead, whether evaluation of the . . . claim is inextricably intertwined with consideration of the terms of the labor contract." *Lueck*, 471 U.S. at 213.  It is our task to determine what entity has the power to decide the

---

[21] To the extent that analogies to primary jurisdiction and arbitration are relevant, these cases illustrate that courts should err on the side of holding that state law claims are preempted.  When protecting the primary jurisdiction of the NLRB for example, the Supreme Court preempts any claim that is even "arguably" within the NLRB's jurisdiction.  *See Garmon*, 359 U.S. at 245.  And the Supreme Court has long recognized that the FAA preempts state rules that frustrate the "liberal federal policy favoring arbitration." *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346, 352 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

merits of Masserant's dispute.    Maj. Op. at 17; *Lueck*, 471 U.S. at 214.**[22]**

In sum, Supreme Court and our precedent dictate that we must understand the nature, or "legal character" of a state-law cause of action before we can address the question whether the cause of action has been displaced by the preemptive force of the RLA.  It is the majority that stands alone in suggesting that the proper construction of state law is irrelevant to whether a cause of action, brought under that state law, is preempted by the RLA.    Therefore, the majority's crucial presumption—that because of the RLA's unique forum preemption, courts may not consider state law when deciding whether the RLA preempts a state cause of action—is entirely meritless.

IV

The majority's erroneous approach allows Masserant to sidestep the RLA's mandatory arbitral mechanism, and thus

---

**[22]** Construing the scope of state law to determine the legal character of Masserant's claim is not a "peek" at the merits of her dispute.  *Cf. Am. W. Airlines, Inc. v. Nat'l Mediation Bd.*, 119 F.3d 772, 775–76 (9th Cir. 1997) (holding that because judicial review of the decisions of the National Mediation Board is limited to circumstances when the Board "committed a constitutional violation or egregious violation of the RLA," a court may "'peek' at the merits" to determine if such an error has occurred).    A determination that Masserant's claim requires an interpretation of the CBA does not require any inquiry into the merits of her claim—that she is entitled to reschedule vacation time.  Masserant's ultimate ability to reschedule her vacation time remains unresolved.

is contrary to Supreme Court precedent and common sense.**[23]**
*See Hawaiian Airlines*, 512 U.S. at 252–53.

The majority claims that because a court cannot look at
state law, it is limited to considering whether the claim, as
pleaded, constitutes a minor dispute.  Maj. Op. at 29.
Therefore, the majority argues, we must take at face value
Masserant's claims that WFCA gives employees the right to
reschedule vacation time regardless of any provision to the
contrary in the CBA.  Maj. Op. at 29–30; *see also* Maj. Op.
at  24 ("Our only job is to decide whether, as pleaded, the
claim 'in this case is "independent" of the [CBA] in the sense
of "independent" that matters for . . . pre-emption purposes:
resolution of the state-law claim does not require construing
the collective-bargaining agreement.'" (alteration in original)
(quoting *Lingle*, 486 U.S. at 407)).

As shown above, the premises underlying this approach
are meritless.  To the contrary, the Supreme Court has made

---

**[23]** The majority claims that preemption here would permit federal
courts "to police the development of substantive state law," by "inhibiting
the state from creating precedent on the meaning of its own statutes
through the ordinary process of state court appeals."  Maj. Op. at 34.  This
is incorrect.  For instance, if a state court merely needed to "look to" the
undisputed terms of the collective bargaining agreement to ascertain that
the employee was entitled to sick leave or other paid time off, the RLA
would not defeat the employee's state-law claim, and a state court could
enforce the employee's right to choose to use that time to care for a
qualifying relative.  *See Livadas*, 512 U.S. at 125; *Lingle*, 486 U.S. at 407
n.7.   Similarly, a state court would be free to construe WFCA in a
preemption analysis when the plaintiff is entitled to sick leave or other
paid time off under an employer policy.  L&I and Washington courts are
merely precluded from deciding whether Masserant is "entitled to"
vacation time under the terms of the CBA, and whether she otherwise
complied with the terms of the CBA.

clear that a plaintiff cannot avoid the RLA's preemptive effect based on artful pleading. Just as *Rawson* declined to allow plaintiffs to avoid preemption by offering a colorable interpretation of state law through artful pleading, 495 U.S. at 371–72, the Court has generally refused to adopt a rule that "permit[s] an individual to sidestep available grievance procedures" through clever pleading, *Lueck*, 471 U.S. at 220; *see also Lingle*, 486 U.S. at 411. As the Court noted in *Lueck*, a gifted lawyer can readily reformulate a minor dispute as a state cause of action, and "[c]laims involving vacation or overtime pay, work assignment, unfair discharge—in short, the whole range of disputes traditionally resolved through arbitration—could be brought in the first instance in state court," as a state tort claim for instance. 471 U.S. at 219–20. The insistence that a court must take a plaintiff's pleadings at face value "would cause arbitration to lose most of its effectiveness, as well as eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Id.* at 220 (citation omitted).[24]

---

[24] No case cited by the majority, Maj. Op. at 23, supports the proposition that a court must take a plaintiff's pleadings at face value. *See, e.g.*, *Espinal v. Nw. Airlines*, 90 F.3d 1452, 1457 (9th Cir. 1996) (holding that plaintiff's state-law claims were not preempted by the RLA after conducting a three-part analysis into the legal character of the claims, namely: "(1) Does the CBA contain provisions that govern the actions giving rise to the state claim? (2) Is the state statute 'sufficiently clear' so that the claim can be evaluated without consideration of overlapping provisions in the CBA? (3) Has the state shown an intent not to allow the statute to be altered or removed by private contract?" (quoting *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514, 1523 (9th Cir. 1995))).

In short, neither the Supreme Court nor we have been hesitant to construe state law in order to determine the legal character of a state-law cause of action, and have certainly not taken the plaintiff's formulation of a state-law complaint at face value. The majority makes a crucial error in reasoning that something about the nature of RLA preemption precludes construing WFCA in order to determine whether a state-law cause of action is actually a minor dispute.

V

The Supreme Court has a well-developed body of case law directing lower courts on how to conduct a preemption analysis, both inside and outside the labor-law context. The majority departs from this precedent on the grounds that courts are precluded from considering state law in deciding whether the state cause of action is actually a minor dispute that requires resolution by the RLA's arbitral mechanism. In doing so, the majority allows plaintiffs to sidestep available, federally-required grievance procedures. This approach is contrary to Supreme Court guidance and Congress's intent. Because all minor disputes must be resolved through the RLA's mandatory arbitral mechanism, the key mechanism for "minimizing interruptions in the Nation's transportation services," *Int'l Ass'n of Machinists*, 372 U.S. at 687, I dissent.